**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| THE BOARD OF TRUSTEES OF THE GLAZING HEALTH AND WELFARE TRUST; BOARD OF TRUSTEES OF THE SOUTHERN NEVADA GLAZIERS AND FABRICATORS PENSION TRUST FUND; BOARD OF TRUSTEES OF THE PLUMBERS AND PIPEFITTERS UNION LOCAL 525 PENSION PLAN; THE BOARD OF TRUSTEES OF THE PAINTERS, GLAZIERS AND FLOORCOVERERS JOINT APPRENTICESHIP AND JOURNEYMAN TRAINING TRUST; THE BOARD OF TRUSTEES OF THE PAINTERS, GLAZIERS AND FLOORCOVERERS SAFETY TRAINING TRUST FUND; THE BOARD OF TRUSTEES OF THE PAINTERS AND FLOORCOVERERS JOINT COMMITTEE; THE BOARD OF TRUSTEES OF THE SOUTHERN NEVADA PAINTERS AND DECORATORS AND GLAZIERS LABOR-MANAGEMENT COOPERATION COMMITTEE TRUST; THE BOARD OF TRUSTEES OF THE INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES INDUSTRY PENSION FUND; THE BOARD OF TRUSTEES OF THE EMPLOYEE PAINTERS' TRUST; THE | No. 16-15588<br><br>D.C. No.<br>2:15-cv-01754-KJD-VCF<br><br><br>OPINION |

BOARD OF TRUSTEES OF THE
CONSTRUCTION INDUSTRY AND
LABORERS HEALTH AND WELFARE
TRUST; THE BOARD OF TRUSTEES OF
THE CONSTRUCTION INDUSTRY AND
LABORERS JOINT PENSION TRUST;
THE BOARD OF TRUSTEES OF THE
CONSTRUCTION INDUSTRY AND
LABORERS VACATION TRUST; THE
BOARD OF TRUSTEES OF SOUTHERN
NEVADA LABORERS LOCAL 872
TRAINING TRUST; BOARD OF
TRUSTEES OF THE PLUMBERS AND
PIPEFITTERS LOCAL 525 HEALTH AND
WELFARE TRUST AND PLAN; BOARD
OF TRUSTEES OF THE PLUMBERS AND
PIPEFITTERS UNION LOCAL 525
PENSION PLAN; BOARD OF TRUSTEES
OF PLUMBERS AND PIPEFITTERS
LOCAL UNION 525 APPRENTICE AND
JOURNEYMAN TRAINING TRUST FOR
SOUTHERN NEVADA,
          *Plaintiffs-Appellees*,

v.

SHANNON CHAMBERS, Nevada Labor
Commissioner, in her official
capacity,
          *Defendant-Appellant.*

Appeal from the United States District Court
for the District of Nevada
Kent J. Dawson, Senior District Judge, Presiding

Argued and Submitted March 12, 2018
San Francisco, California

Filed September 4, 2018

Before:  J. Clifford Wallace and Consuelo M. Callahan,
Circuit Judges, and James V. Selna,[*] District Judge.

Opinion by Judge Callahan;
Dissent  by Judge Wallace

---

[*] The Honorable James V. Selna, United States District Judge for
the Central District of California, sitting by designation.

## SUMMARY[**]

### ERISA Preemption / Mootness

Vacating the district court's summary judgment in favor of the plaintiffs, the panel held that Nevada Senate Bill 223 was a legitimate exercise of Nevada's traditional state authority and was not preempted by the Employee Retirement Income Security Act.

Nevada law holds general contractors vicariously liable for the labor debts owed by subcontractors to subcontractors' employees on construction projects. SB 223 limited the damages that can be collected from general contractors and imposed notification requirements on contractors and welfare benefit plans regulated under ERISA before an action could be brought under Nevada law against general contractors. Plaintiffs, ERISA trusts that managed ERISA plans, claimed that SB 223 was preempted by ERISA because it impermissibly "related to" ERISA plans.

The panel concluded that the appeal was not moot following the Nevada legislature's repeal of SB 223 and enactment of SB 338, a replacement that repeats some of the challenged aspects of SB 223. The panel held that legislative change in response to an adverse judicial ruling is generally the type of "voluntary cessation" that defeats mootness on appeal. The panel concluded that Nevada did not rebut a presumption that its appeal was not moot because it did not

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

demonstrate that the legislature would certainly not reenact the challenged provisions of SB 223.

On the merits, the panel held that SB 223 was not preempted because it did not intrude on any federally-regulated field, conflict with ERISA's objectives, or otherwise impermissibly "relate to" ERISA plans. Instead, it targeted an area of traditional state concern—debt collection—and pared back a state-conferred entitlement to collect unpaid debts from third-party general contractors. The panel explained that ERISA empowers ERISA trusts to bring actions against subcontractors for subcontractors' labor debts, but it does not establish a cause of action for collecting debts from non-parties to an ERISA plan, such as general contractors. That right exists, if at all, as a matter of state vicarious liability law. The panel held that, because SB 223 targeted an area of traditional state regulation, a presumption against preemption applied. The panel concluded that SB 223 did not invade the federal field regulated by ERISA or pose an obstacle to ERISA's objectives; rather, plaintiffs' obligations under ERISA remained the same with or without SB 223. Thus, SB 223 had neither an impermissible "connection with" nor did it make an impermissible "reference to" ERISA plans. The panel vacated the district court's grant of summary judgment and remanded for entry of judgment consistent with the panel's opinion.

Dissenting, Judge Wallace wrote that it was his conclusion that the Nevada legislature's repeal of SB 223, and its enactment of SB 338, mooted the appeal. Judge Wallace explained that the general rule in this circuit is that statutory change is generally enough to render a case moot unless the case presents a rare situation, such as "where it is virtually certain that the repealed law will be reenacted." In

this case, Judge Wallace concluded that the Nevada legislature's repeal and replacement of SB 223 amounted to a "complete statutory overhaul," and that there was no indication the legislature intended to reenact the repealed law. Therefore, in Judge Wallace's view, there was no reason to depart from the rule that statutory change is usually enough to render a case moot.

## COUNSEL

Joseph F. Tartakovsky (argued), Deputy Solicitor General; Adam Paul Laxalt, Attorney General; Office of the Attorney General, Carson City, Nevada; for Defendant-Appellant.

Wesley J. Smith (argued) and Daryl E. Martin, Christensen James & Martin, Las Vegas, Nevada; Bryce C. Loveland and Adam P. Segal, Brownstein Hyatt Farber Schreck LLP, Las Vegas, Nevada; Sean W. McDonald and Michael A. Urban, The Urban Law Firm, Las Vegas, Nevada; for Plaintiffs-Appellees.

Sarah Bryan Fask, Littler Mendelson P.C., Philadelphia, Pennsylvania; Richard N. Hill, Littler Mendelson P.C., San Francisco, California; for Amicus Curiae Nevada Contractors Association.

Kevin C. Powers, Chief Litigation Counsel; Brenda J. Erdoes, Legislative Counsel; Nevada Legislative Counsel Bureau, Legal Division, Carson City, Nevada; for Amicus Curiae Nevada Legislature.

Laurie A. Traktman, Gilbert & Sackman, Los Angeles, California, for Amici Curiae Board of Trustees of the Sheet Metal Workers' Pension Plan of Southern California, Arizona and Nevada, and Board of Trustees of the Sheet Metal Workers' Health Plan of Southern California, Arizona and Nevada.

**OPINION**

CALLAHAN, Circuit Judge:

Nevada law holds general contractors vicariously liable for the labor debts owed by subcontractors to subcontractors' employees on construction projects. In recent years, the Nevada legislature became concerned that its vicarious liability law was unfairly burdening general contractors with substantial liabilities. The legislature found that certain entities, in particular trusts that manage health and welfare benefit plans and which represent aggrieved employees in labor debt recovery actions, were suing general contractors years after labor debts accrued. Since a 2009 decision of our court, those suits could seek money damages not just for uncollected debts, but also for the trusts' legal fees and other costs incurred attempting to collect on those debts from subcontractors. The upshot was that unsuspecting general contractors were discovering years later that they owed the subcontractors' debts—and then some.

In an effort to remedy this perceived problem, in 2015 the Nevada legislature unanimously approved SB 223. The law limits the damages that may be collected from general contractors. It also imposes notification requirements on contractors and welfare benefit plans regulated under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*., before an action may be brought under Nevada law against general contractors.

Plaintiffs-Appellees are ERISA trusts that manage ERISA plans. They claim SB 223 is preempted by ERISA because, they argue, it impermissibly "relates to" ERISA plans. They reason that the law intrudes on ERISA's uniform regulatory scheme by imposing additional administrative burdens on ERISA trusts like themselves, and

by infringing ERISA trusts' fiduciary duty to manage plan funds.  The district court agreed and granted Appellees' motion for summary judgment.  We conclude, however, that SB 223 does not intrude on any federally-regulated field, conflict with ERISA's objectives, or otherwise impermissibly "relate to" ERISA plans.  Instead, it targets an area of traditional state concern—debt collection—and pares back a state-conferred entitlement to collect unpaid debts from third-party general contractors.  Accordingly, we hold that SB 223 is a legitimate exercise of Nevada's traditional state authority and **VACATE** the district court's judgment.[1]

## I.

## A.

Nevada law provides that employees on construction projects who cannot collect on labor debts from their employers (i.e., subcontractors[2]) may compel payment from general contractors.  Nev. Rev. Stat. Ann. § 608.150 *et seq.* Such debts may include wages that subcontractors owe their employees and benefit contributions those subcontractors

---

[1] Appellant's motion for judicial notice and the Nevada Legislature's motion to file an amicus brief are **GRANTED**.  Appellees' motion to dismiss is **DENIED**.

[2] For simplicity, we use the term "subcontractor" to refer to the entity that negotiates and enters into an employee contribution agreement—an ERISA plan—with an ERISA trust for the benefit of the subcontractors' employees.  Similarly, we use the term "general contractor" as shorthand for an entity that may be subject to vicarious liability under Nevada law but which is not party to an ERISA plan.  In reality, a "general contractor" may be party to an ERISA plan, and in that case vicarious liability—the debt collection tool at issue here—would not apply.

are required to make to health and welfare benefit plans—i.e., "ERISA plans"—on behalf of their employees.

Appellees are trusts ("ERISA trusts" or "Taft-Hartley trusts") that administer a particular type of ERISA plan: plans covering multiple employers, oftentimes across several States. "A multiemployer plan is a collectively bargained [ERISA] plan maintained by more than one employer, usually within the same or related industries, and a labor union." Pension Benefit Guaranty Corp., *Introduction to Multiemployer Plans*, *available at* http://goo.gl/6RJgoS (last accessed July 12, 2018). Multiemployer plans are typically administered and managed by a board of trustees, represented equally by labor and management. *Id.* Through their administration of multiemployer plans, Appellees provide welfare and pension benefits to employees that perform work in the construction industry. Those benefits, as well as employers' (i.e., subcontractors') contribution obligations to the plans, are negotiated by employees—oftentimes through a union representative—and employers, and are set forth in the plans themselves. *Id.*

As is pertinent here, ERISA empowers ERISA trusts to bring actions against subcontractors for subcontractors' labor debts. 29 U.S.C. §§ 1132(g)(2), 1145. Those debts can include subcontractors' delinquent contributions to the ERISA plans, as well as wages owed employees. *Id.* § 1132(g)(2). ERISA does not, however, establish a cause of action for collecting debts from non-parties to an ERISA plan, like general contractors. That right exists, if at all, as a matter of state vicarious liability law. *See Trs. of the Constr. Indus. and Laborers Health and Welfare Trust v. Hartford Fire Ins. Co.*, 578 F.3d 1126, 1127–28 (9th Cir. 2009).

**B.**

The Nevada legislature became concerned in recent years that its vicarious liability law was unfairly saddling general contractors—i.e., non-parties to ERISA plans—with the debts of subcontractors. General contractors found themselves threatened with lawsuits by, among other entities, ERISA trusts, who sought to hold them vicariously liable for debts owed their members by subcontractors, sometimes several years later. Those debts consisted of delinquent wage and benefit contributions, as well as attorneys' fees and other costs resulting from protracted legal action between ERISA trusts and subcontractors. A 2009 per curiam opinion of this court contributed to this trend by interpreting "labor indebtedness" under Nevada's vicarious liability statute to include "liquidated damages and attorneys' fees arising from a collective bargaining agreement [CBA]." *Hartford Fire Ins.*, 578 F.3d at 1129. Thus, after *Hartford Fire Insurance*, ERISA trusts like Appellees could litigate against potentially insolvent subcontractors for years, knowing that, should the litigation fail to make them whole, they could recover their legal expenses from general contractors later.

In 2015, the Nevada legislature unanimously approved SB 223 to address the situation. The law had two main goals. First, it sought to reduce the liability faced by unsuspecting general contractors years after they had closed the books on a project. It did so by shortening the statute of limitations period to one year (SB 223 § 2) and limiting general contractors' vicarious liability to debts owed employees under a CBA (SB 223 §§ 1(2) & 3(2)).

Second, the law sought to increase general contractors' ability to address subcontractor debts early on. The law imposed a set of mutually reinforcing obligations on ERISA

trusts on the one hand, and subcontractors on the other. Under the revised statutory scheme, ERISA trusts were required to issue pre-lien notices to general contractors, thereby alerting general contractors to potential claims in the case of subcontractor delinquency (SB 223 § 4(8)). They were also required to notify general contractors within sixty days after a debt became delinquent (SB 223 § 5). Thus, §§ 4(8) and 5, read together, gave general contractors early notice of potential claims and a first opportunity to remedy an outstanding debt with a subcontractor.

In return, upon commencement of a project, a contractor (general or sub) that was party to an ERISA plan was required to notify the ERISA trust of the project (SB 223 § 4(7)). This provision thereby afforded trusts an opportunity to monitor subcontractor performance and identify delinquencies early on.

Some of SB 223's six provisions specifically referenced ERISA plans. They did so by variously referring to "health or welfare funds" (§§ 1(2), 4(7)), "trust funds" that collect and manage benefits and other forms of compensation for workers (§ 4(8)), and Taft-Hartley trusts (§ 5(1)).[3]

---

[3] The Taft-Hartley Act (aka the Labor Management Relations Act ("LMRA")) allows employer contributions to ERISA plans. *See* 29 U.S.C. § 1002(37). A "Taft-Hartley plan" is synonymous with an ERISA plan. *See UMW Health & Ret. Funds v. Robinson*, 455 U.S. 562, 575 (1982) (Taft-Hartley plans are subject to ERISA); *Hurn v. Ret. Fund Trust of the Plumbing, Heating & Piping Indus. of S. Cal.*, 703 F.2d 386, 391 (9th Cir. 1983) ("the Taft-Hartley provisions parallel the ERISA provisions and the trustees must meet the requirements of each"). As for the other identifying terms, they describe ERISA plans because ERISA applies to most "any employee benefit plan," 29 U.S.C. § 1003(a), and "employee welfare benefit plan" and "employee pension benefit plan" are defined terms under ERISA, *id.* § 1002(1), (2)(A).

SB 223's six modifications to Nevada's vicarious liability law, Nev. Rev. Stat. § 608.150 *et seq.*, are as follows:

**The Damages Amendments (§§ 1(2) & 3(2)):** While maintaining general contractors' vicarious liability for subcontractor debts, the damages amendments limited the scope of that liability. Section 1(2) exempted a general contractor from

> any liability of a subcontractor or other contractor for any penalty, including, without limitation, interest, liquidated damages, attorney's fees or costs for the failure of the subcontractor or other contractor to make any contributions or other payments under any other law or agreement, including, without limitation, to a health or welfare fund or any other plan for the benefit of employees in accordance with a [CBA].

For its part, the pre-amendment version of § 3(2) identified ERISA plans, and stated that the term "'laborer' includes, without limitation, an express trust fund to which any portion of the total compensation of a laborer, including . . . any fringe benefit, must be paid pursuant to an agreement with that laborer or the collective bargaining agent of that laborer." SB 223 modified § 3(2)—without adding any additional mention of ERISA plans—by excluding from "fringe benefit" "any interest, liquidated damages, attorney's fees, costs or other penalties that may be incurred by the employer of the laborer for failure to pay any such compensation under any law or contract."

**The Statute of Limitations Amendment (§ 2):** Section 2 shrunk the statute of limitations period for an action against

a general contractor from three or four years (depending on the location of the contractor) to one year.  Notably, unlike the other four amendments, § 2 made no mention of ERISA plans or trusts.

**The Commencement Notice Amendment (§ 4(7)):** Section 4(7) provided that "[u]pon commencement of work on a project, any prime contractor or subcontractor participating in a health or welfare fund or any other plan for the benefit of employees is required to notify such fund or plan of the name and location of the project so that the fund or plan may protect potential lien rights under [Nevada law]."

**The Pre-Lien Notice Amendment (§ 4(8)):**  Section 4(8) required ERISA trusts to provide notice of a right to lien against property owners.  It clarified that ERISA trusts are not alter egos of the workers whose interests they represent, and so do not enjoy laborers' exemption from the lien notice requirement.  Accordingly, § 4(8) provided that "'one who performs only labor' does not include an express [ERISA] trust fund . . . ."

**The Delinquency Notice Amendment (§ 5(1)–(5)):** Section 5 provided, in relevant part, that "[i]f an administrator of a Taft-Hartley trust which is formed pursuant to 29 U.S.C. § 186(c)(5) does not receive a benefit payment owed to the trust within 60 days . . . the administrator shall provide a notice of the delinquency to the general contractor and, if applicable, the subcontractor, who is responsible for the benefit payment."

## C.

ERISA is a comprehensive federal statutory scheme governing employee benefit plans.  *Boggs v. Boggs*, 520 U.S.

833, 841 (1997). "All employee benefit plans must conform to various reporting, disclosure, and fiduciary requirements, [29 U.S.C.] §§ 1021–1031, 1101–1114, while pension plans must also comply with participation, vesting, and funding requirements, see §§ 1051–1086." *Id.* ERISA does not

> requir[e] employers to provide any given set of minimum benefits, but instead controls the administration of benefit plans, see § 2, 29 U.S.C. § 1001(b), as by imposing reporting and disclosure mandates, §§ 101–111, 29 U.S.C. §§ 1021–1031, participation and vesting requirements, §§ 201–211, 29 U.S.C. §§ 1051–1061, funding standards, §§ 301–308, 29 U.S.C. §§ 1081–1086, and fiduciary responsibilities for plan administrators, §§ 401–414, 29 U.S.C. §§ 1101–1114.

*N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 650 (1995). ERISA also includes a preemption provision, which states that ERISA "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . ." 29 U.S.C. § 1144(a).

### D.

Appellees filed suit in Nevada federal district court against Defendant-Appellant Shannon Chambers, Nevada's Labor Commissioner (hereafter the "State" or "Nevada"), seeking a declaration that ERISA preempts SB 223. The district court granted summary judgment for Appellees. *The Board of Trs. of the Glazing Health and Welfare Trust v. Shannon Chambers*, 168 F. Supp. 3d 1320, 1325 (D. Nev. 2016). The court deemed SB 223 preempted because, it

found, the law was "specifically design[ed] to affect employee benefit plans." *Id*. at 1323. It concluded that the law thereby had an impermissible "connection with or reference to" ERISA plans. *Id*. at 1324. Noting that ERISA regulates plan reporting requirements, the court determined that SB 223's imposition of reporting provisions—i.e., the pre-lien and delinquency notice amendments—unlawfully regulated in an area governed exclusively by ERISA. *Id*.

The district court also determined that any non-offending provisions could not be preserved because, it found, SB 223 was not severable. *Id*. at 1324–25. First, SB 223 includes no severability clause, which the court took to indicate a legislative intent that it operate either as a cohesive whole or not at all. *Id*. at 1324. Second, the court found that "it is clear from the legislative history that all the amended sections adopted under SB 223 were intended to work together, rather than independently." *Id*. at 1325. The court did not, however, indicate whether it found any single provision *not* preempted, such that deciding severability was even necessary.**[4]** Nevada timely appealed.

---

**[4]** Nevada argues that the district court did, in fact, determine that the statute of limitations amendment (§ 2) was not preempted. The State's understanding is not unreasonable because the district court declared that "[i]t is clear that Section 2(1) of SB 223, which shortens the limitations period, could stand alone." *Chambers*, 168 F. Supp. 3d at 1325. But that understanding is arguably negated by the court's next sentence, which states that § 2(1)'s adoption "was only seen as reasonable as part of a larger political process in which, in exchange for the shorter limitations period, Section 4 of SB[]223 amends NRS § 108.245 to require contractors participating in a health or welfare benefit plan to provide project-specific information to the plans." *Id*. Thus, we do not read the district court's disposition as holding that § 2(1) could stand alone. At any rate, because we hold that SB 223 is not preempted, the ambiguity in the district court's decision is a moot point.

## II.

Before proceeding to the merits, we must decide whether Nevada's appeal is moot. In response to the district court's invalidation of SB 223, in July 2017 the Nevada legislature repealed SB 223 and replaced it with a new law, SB 338. SB 338 does not include the challenged notice and damages amendments (§§ 1(2), 3(2), 4(7), 4(8), 5(1)) from SB 223, and the repeal of those provisions was made retroactive to the enactment of SB 223. SB 338 also includes a truncated statute of limitations provision, which is not retroactive. The new limitations period is two years—up from SB 223's one year—which is still short of the pre-SB 223 period of up to four years. Because SB 338's limitations period was not made retroactive, Nevada argues that leaving the district court's determination undisturbed is causing actual and imminent harm: the four-year pre-223 limitations period is in place, rather than SB 223's one-year period, for the years 2015 to 2017. With the exception of the limitations provision, which only the State argues presents a live controversy, the parties agree the appeal is moot. Notwithstanding the parties' partial agreement on mootness, however, we must independently assess whether a live controversy exists on appeal. *Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 628 (9th Cir. 2016). We therefore proceed to conduct our own analysis to determine whether the appeal is moot.

## A.

To avoid mootness, "an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997) (internal quotation marks and citation omitted). This means a plaintiff must satisfy the irreducible constitutional minimum of Article III standing at

each stage of litigation, including on appeal.   Standing requires that a plaintiff suffer an (1) injury-in-fact that is actual or imminent and concrete and particularized, rather than speculative or hypothetical; that is (2) fairly traceable to the conduct complained of; and (3) which is likely to be redressed by a favorable ruling.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

While mootness is normally a question of a court's subject matter jurisdiction, in some cases it is a prudential rather than a jurisdictional limitation on our review.  *Coral Constr. Co. v. King Cnty.*, 941 F.2d 910, 927 (9th Cir. 1991). As is relevant here, "in cases involving the amendment or repeal of a statute or ordinance, mootness is 'a matter relating to the exercise rather than the existence of judicial power.'"  *Id.* (quoting *Carreras v. City of Anaheim*, 768 F.2d 1039, 1047 (9th Cir. 1985)).   In that situation "we may continue to exercise authority over a purportedly moot case where the balance of interests favors such continued authority.   The party moving for dismissal on mootness grounds bears a heavy burden."  *Id.* at 927–28.

Where, as here, the legislature repealed a law in response to an adverse judicial ruling, that burden may be insurmountable.   In *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 288–89 (1982), the Supreme Court considered whether a challenge to a repealed statutory provision was moot.  The lower court had invalidated the provision, and the city subsequently repealed it pending appeal.  *Id.* at 288.  The Court began by explaining that a legislative change falls into the category of actions constituting "voluntary cessation of a challenged practice," which "does not deprive a federal court of its power to determine the legality of the practice." *Id*. at 289.  And because an appellate court's determination that a case is moot generally means that "the judgment below

is . . . vacated with directions to dismiss the complaint," *id.* at 288 n.9, a finding of mootness would free the government to reenact the same previously rejected law, *id.* at 289.[5] Thus, in *City of Mesquite*, "the city's repeal of the objectionable [statutory] language would not preclude it from reenacting precisely the same provision if the District Court's judgment were vacated." *Id.*

*City of Mesquite* went on to explain that "[t]he test for mootness in cases such as this is a stringent one." *Id*. at 289

---

[5] Should we deem this appeal moot, vacatur would be compelled under the "equitable tradition of vacatur." *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 25 (1994). Where the losing party in district court takes an action that moots the appeal, equity counsels against vacatur: the party had an opportunity to secure a merits ruling on appeal, but of its own accord opted to forfeit that right. *Id.* at 25–27. By the same token, equity counsels against depriving the party that won below of that judicial determination due only to the losing party's post-judgment remedial action. *See id.*

Here, however, the party that lost in district court—Shannon Chambers, an employee in Nevada's executive branch—is not part of the branch of government that allegedly mooted the appeal. That entity is, instead, the Nevada legislature. The distinction has legal import for deciding whether vacatur would be appropriate in the case of mootness. As we have explained, "[e]ven where new legislation moots the executive branch's appeal of an adverse judgment, the new legislation is not attributed to the executive branch." *Chem. Prods. & Distribs. Ass'n v. Helliker*, 463 F.3d 871, 879 (9th Cir. 2006). Indeed, "[t]he principle that legislation is attributed to the legislature alone is inherent in our separation of powers." *Id.* Thus, because mootness here would not result from an action by the party seeking appellate review (the executive branch), should we deem the appeal moot we would also direct vacatur of the district court's judgment. *See id.* at 878–79; *see also City of Mesquite*, 455 U.S. at 289; *Bonner Mall*, 513 U.S. at 25. That would, of course, liberate the Nevada legislature to reenact any or all aspects of SB 223.

n.10.  To avoid mootness there, the city needed to show that
it was "absolutely clear that the allegedly wrongful behavior
could not reasonably be expected to recur."  *Id.*  The city
could have done so by demonstrating that "[t]here is . . .
certainty that a similar course"—i.e., reenacting the
invalidated law—"would not be pursued . . . ."  *Id.* at 289.
Simply dispensing with the offending provision in the face
of judicial rejection fails to make the requisite showing, and
the city did not satisfy that standard in *City of Mesquite*.  *Id.*
Thus, the Court found that it "must confront the merits" of
the then-repealed law's legality.**[6]**  *Id.*

---

**[6]** The dissent argues that *City of Mesquite* is *sui generis* because the
city there announced its intention to reenact the rejected law should the
case be deemed moot.  Dissent at 55–57.  It asserts that we should focus
our attention instead on a case pre-dating *City of Mesquite*, *Kremens v.
Bartley*, 431 U.S. 119 (1977).  But *City of Mesquite* did not rely on the
discrete factual detail of the city's avowed intention, which the Court
relegated to a footnote.  *City of Mesquite*, 455 U.S. at 289 n.11.  Instead,
it focused on the fact that vacatur of the district court's decision via
mootness (*see* footnote 4, *supra*) meant the city would have the *power* to
reenact the same invalidated law.  *Id.* at 289.  Moreover, the Supreme
Court has made crystal clear that *City of Mesquite* is the authority *de
rigueur* on the question of mootness-due-to-legislative-change, not
*Kremens*.  In *Northeastern Florida Chapter of Associated General
Contractors of America v. City of Jacksonville, Florida*, 508 U.S. 656,
661–62 (1993), the Court explained that this particular issue "is
controlled by *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283
(1982), where we applied the 'well settled' rule that 'a defendant's
voluntary cessation of a challenged practice does not deprive a federal
court of its power to determine the legality of the practice.'" (quoting
*City of Mesquite*, 455 U.S. at 289).  There, as here (*see* Part II.B., *infra*),
the government enacted new legislation that repeated some of the
allegedly unlawful aspects of the invalidated and subsequently repealed
law.  *Id.* at 662.  The Court held that the case was not moot "because the
defendant's 'repeal of the objectionable language would not preclude it
from reenacting precisely the same provision if the District Court's
judgment were vacated.'"  *Id.* (quoting *City of Mesquite*, 455 U.S. at

We have largely adhered to the rule set forth in *City of Mesquite*, explaining that where a change in the law is prompted by an adverse district court ruling, an appeal is generally not moot. *See, e.g.*, *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1125 (9th Cir. 2011) (case not moot where the city adopted a new law "in direct response to the district court's" judgment); *Jacobus v. Alaska*, 338 F.3d 1095, 1103 (9th Cir. 2003) (explaining that a case is unlikely to be moot because the state legislature repealed statutory provisions "in response to the district court's judgment"); *Carreras*, 768 F.2d at 1047; *see also Smith v. Univ. of Washington*, 233 F.3d 1188, 1194 (9th Cir. 2000) (explaining that a case is less likely to be moot where a legislative change occurs "because of the prodding effect of [] litigation"); *cf. Coral Constr.*, 941 F.2d at 928 (sufficient to show that county would have the *power* to reenact an ordinance in light of a district court's judgment to defeat mootness); *but see Log Cabin Republicans v. United States*, 658 F.3d 1162, 1166 (9th Cir. 2011) (case moot where legislative change was likely in response to adverse district court judgment).

For example, in *Carreras*, we reasoned that "repeal of the objectionable language [does] not deprive the federal

---

289).  Thus, the Court rejected the assertion made by the dissent in our case that an appeal following legislative change is moot unless the legislature is "virtually certain" to reenact the challenged legislation. *Cf.* Dissent at 60–61.

Further, while a citation to *Kremens* is found in *Northeastern Florida*, it is in the *dissent*'s contrary conclusion that the case *was* moot. *Id.* at 671 (O'Connor, J., dissenting).  The juxtaposition of *City of Mesquite* in the seven-justice majority opinion with *Kremens* in the two-justice dissent makes plain that our lodestar is *City of Mesquite*, not *Kremens*.

courts of jurisdiction to decide the constitutional question because of the well-settled principle 'that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" 768 F.2d at 1047 (quoting *City of Mesquite*, 455 U.S. at 289). As in *City of Mesquite*, the law's repeal in *Carreras* was in response to an adverse ruling by the district court. *Id.* Similarly, in *Jacobus*, we explained that concerns over the defendant "return[ing] to his old ways" applied with "particular force [there because] the 'voluntary cessation' occurred *only in response to the district court's judgment*." 338 F.3d at 1103 (internal quotation marks omitted) (emphasis added).

Where we have held that repeal of a law effectively mooted a case, the repeal was generally not in response to an adverse district court judgment. *See, e.g.*, *Smith*, 233 F.3d at 1194 (challenged law repealed before the district court even ruled on the law); *Native Village of Noatak v. Blatchford*, 38 F.3d 1501, 1511 (9th Cir. 1994) ("Here, the legislature repealed § 29.89.050 before Noatak even initiated its lawsuit . . . . This is not a case where a defendant voluntarily ceases challenged action in response to a lawsuit."); *Matter of Bunker Ltd. P'ship*, 820 F.2d 308, 311 (9th Cir. 1987) (no indication that Congress enacted sweeping amendments to a comprehensive national regulatory scheme governing hazardous waste in response to a discrete district court ruling on a motion to quash a warrant); *Burke v. Barnes*, 479 U.S. 361, 363 (1987) (bill automatically expired during pendency of appeal); *U.S. Dep't of Treasury, Bureau of Alcohol, Tobacco & Firearms v. Galioto*, 477 U.S. 556, 559 (1986)

(Congress modified the law "as a matter of legislative policy," not in response to the district court's decision).**[7]**

Unlike the constellation of cases that includes *Mesquite*, *Thalheimer*, *Jacobus, Carreras*, and the instant matter, a finding of mootness in *Noatak* and *Smith* would not have removed the one impediment—the district court's adverse ruling—to the government repeating the allegedly unlawful conduct.  And while an adverse judicial ruling existed in *Bunker Ltd.*, *Barnes*, and *Galioto*, that ruling was not the impetus for the subsequent legislative change.  Accordingly, the legislative changes in those cases more forcefully indicated an affirmative, permanent intent to change course, rather than a grudging acquiescence to a judicial command.

We hasten to note that our precedent is in some internal tension on mootness-due-to-legislative-change.  Two of our cases in particular warrant discussion.  In *Chemical Products & Distributors Ass'n v. Helliker*, 463 F.3d 871 (9th Cir. 2006), we found that a legislative change sufficed to moot the appeal.  *Id.* at 875.  There, plaintiffs challenged a California law as preempted.  *Id.* at 874.  The district court *upheld* the law, but while plaintiffs' appeal was pending, the California legislature repealed it and replaced it with new legislation.  *Id.* at 874–75.  Critically, the new law entirely "resolved [plaintiffs'] grievance" with the challenged law.  *Id*. at 876.  We concluded that because "the law ha[d] been

---

**[7]** The dissent focuses on the *Noatak* line of cases for the proposition that legislative change generally suffices to moot an appeal.  Dissent at 59.  But it does not address our precedent—*Thalheimer*, *Jacobus*, and *Carreras*, *supra*—going the other way.  Our opinion gives effect to both sets of cases by addressing a key distinguishing circumstance: while *Noatak* and its progeny reflect a voluntary legislative change, the *Thalheimer* line of cases involves legislative change in response to an adverse district court judgment.

'sufficiently altered so as to present a substantially different controversy from the one the District Court originally decided,' there [wa]s 'no basis for concluding that the challenged conduct [was] being repeated.'" *Id.* at 875 (quoting *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 n.3 (1993)). Here, by contrast, the district court *invalidated* Nevada's law, and, as explained below, the legislation that replaced SB 223 does not resolve all the problems the district court identified with that law or all of Appellees' bases for challenging it.

If *Helliker* had ended its analysis there, then it would fit neatly with our circuit's precedent. But *Helliker* also found that the voluntary cessation doctrine, which generally precludes a finding of mootness, did not apply in that particular case. *Id.* at 878. With due respect for our colleagues, we find that *Helliker* departs from *City of Mesquite* on this issue in the circumstance of legislative change due to an adverse district court judgment. *Helliker* got off on the right foot by invoking *City of Mesquite* as controlling precedent on the voluntary cessation doctrine. *Id.* at 877. But it then flipped *City of Mesquite*'s rule that the government must show "*certainty* that a similar course"— reenacting a repealed or revised law—"would not be pursued . . . ." *City of Mesquite*, 455 U.S. at 289 (emphasis added). *Helliker* instead declared that, as a general rule, it is actually the party *contesting mootness* that must show it is "'virtually certain'" that the government would reenact the repealed law.[8] *Helliker*, 463 F.3d at 878 (quoting *Noatak*, 38 F.3d at 1510).

---

[8] *Helliker* relied on this court's decision in *Noatak* for this proposition. But, as noted, *Noatak* dealt with a distinct circumstance:

*Helliker*'s statement may be correct where legislative change does not result from an adverse judicial ruling—as in those cases discussed above and in *Helliker* itself—but its articulation of a near-blanket rule collides with *City of Mesquite*'s holding specific to the circumstance presented there. We are, of course, bound to follow the rule established by the Supreme Court, not inconsistent circuit precedent. *See Hart v. Massanari*, 266 F.3d 1155, 1171 (9th Cir. 2001) (lower court may not "disregard a ruling of the Supreme Court").

*Helliker*'s conflict with *City of Mesquite* had practical effect years later in *Log Cabin Republicans*. There, plaintiffs successfully challenged the military's "Don't Ask, Don't Tell" policy on constitutional grounds. *Log Cabin Republicans*, 658 F.3d at 1165–66. While an appeal was pending, Congress repealed the policy. *Id.* at 1165. The court was therefore confronted with the question of whether a legislative change in response to an adverse judicial ruling mooted the appeal. *Log Cabin Republicans* held, on the factual record in that case, that it did. *Id.* at 1166.

*Log Cabin Republicans* began by acknowledging that "voluntary cessation" will ordinarily not moot a case, citing *City of Mesquite* for this proposition. 658 F.3d at 1167. But in an attempt to square the Supreme Court's rule with *Helliker*, the court forced a distinction between voluntary cessation and "statutory amendment or repeal." *Id.* The court ultimately concluded that voluntary cessation does not "'deprive a federal court of its power to determine the legality of the [challenged] practice,'" *id.* (quoting *City of Mesquite*, 455 U.S. at 289), but that "[r]epeal [of legislation]

---

the legislative change there did not occur after an adverse judicial ruling. *Noatak*, 38 F.3d at 1510.

is 'usually enough to render a case moot, even if the legislature possesses the power to reenact the statute after the lawsuit is dismissed,'" *id.* (quoting *Helliker*, 463 F.3d at 878). But, of course, *City of Mesquite* was all about repeal of legislation. Its reference to voluntary cessation plainly *included* legislative repeal or amendment; it did not wrench the two concepts apart and deposit them into separate camps. We have previously recognized as much, explaining that "repeal of [] objectionable language [does] not deprive the federal courts of jurisdiction to decide the constitutional question *because of the well-settled principle 'that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice*.'" *Carreras*, 768 F.2d at 1047 (quoting *City of Mesquite*, 455 U.S. at 289) (emphasis added). *Log Cabin Republicans*' contrary conclusion is understandable because it relies on *Helliker*, which, as discussed, is inconsistent with *City of Mesquite* where a legislative change is in response to an adverse district court judgment.**[9]** We find more persuasive our cases that accord with *City of Mesquite*.

---

**[9]** *Helliker* is tenuous precedent on this narrow point for an additional reason. In distinguishing *Jacobus*—which explained that the party asserting mootness faces a heavy burden where a legislative repeal is in response to an adverse judicial ruling—*Helliker* states: "The cases we cited in *Jacobus* for a near categorical rule of mootness are cases of statutory amendment. The examples we cited of continuing federal adjudicatory power are of local government or administrative agency repeal or amendment." *Helliker*, 463 F.3d at 878. *Helliker* then proceeded to cite *Jacobus* for this distinction. *Id.* But *Jacobus* squarely falls into *Helliker*'s *first* category of cases; in *Jacobus*, the Alaska legislature amended a statute, and *Jacobus* found that this fact counseled *against* mootness. *Jacobus*, 338 F.3d at 1101–04. Thus, we find

\* \* \*

Having trudged through our admittedly murky precedent, we conclude that, under *City of Mesquite* and the majority of our circuit's case law, legislative change in response to an adverse judicial ruling is generally the type of "voluntary cessation" that defeats mootness on appeal unless the government can show with "certainty" that reenacting a repealed or revised law will "not be pursued."[10]  *City of Mesquite*, 455 U.S. at 289; *Jacobus*, 338 F.3d at 1103; *Carreras*, 768 F.2d at 1047.  That is because where a governmental entity acts under compulsion of a judicial decree rather than on its own initiative, the risk of legislative recidivism is acute once the judicial obstacle to legislative action is removed.

To be sure, we do not foreclose the possibility that a finding of mootness might be appropriate depending on the factual circumstances of a particular matter.  But we are persuaded that, in the typical case, as here, asserting our judicial power makes sense as a matter of judicial prudence. *Coral Constr.*, 941 F.2d at 927 (explaining that whether a case is moot as a result of legislative change is a prudential rather than a jurisdictional issue).  On the one hand, we exercise our jurisdiction—and obligation—to decide discrete controversies that have already been litigated in a judicial forum.  *Cf. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 191–92 (2000) ("[B]y the time mootness is an issue, the case has been brought and

---

problematic *Helliker*'s assertion that our circuit has followed a "near categorical rule of mootness" in the case of "statutory amendment."

[10] The government could meet this rigorous standard by, for example, replacing the challenged portions of the prior law with new legislation that eliminates the gravamen of a plaintiff's complaint.

litigated, often (as here) for years. To abandon the case at an advanced stage may prove more wasteful than frugal."). On the other, we prevent the government from circumventing our oversight role by repealing a law after an adverse ruling in a lower court, benefitting from mootness on appeal that results in vacatur of that ruling, and then enacting a law that shares some or all of the prior law's invalidated provisions.

## B.

With the table set, we address Nevada's repeal of SB 223. We must decide whether Nevada repealed the law in response to the district court's adverse ruling and, if so, if it can rebut the presumption that its appeal is not moot by demonstrating that the legislature will certainly not reenact the challenged provisions of that law.

Nevada plainly repealed SB 223 in response to the district court's ruling. Indeed, the preamble to the law that replaced it, SB 338, expressly invokes the district court's decision as the reason for repealing and replacing SB 223. Legislative Counsel's Digest, SB 338, 2017 Leg., 2017 Reg. Sess. (Nev. 2017). The preamble further asserts that the law resolves the problems identified by the district court. It explains that "[the] bill sets forth amendments that would prevent the provisions of law amended in Senate Bill No. 223 from being preempted." *Id.* Thus, under *City of Mesquite*, *Thalheimer*, *Jacobus*, and *Carreras*, we will not deem the appeal moot absent a showing that Nevada will not reenact any aspect of SB 223. It can meet this burden if, for example, SB 338 completely resolves the issues with SB 223.

Far from meeting this demanding standard, Nevada fails to show even an inclination to avoid all the pitfalls that

bedeviled SB 223 in the district court. Indeed, SB 338 retains several of the challenged aspects of SB 223. *Cf. Maldonado v. Morales*, 556 F.3d 1037, 1042 (9th Cir. 2009) (deeming appeal moot where a legislative change completely eliminated basis for plaintiff's challenge); *Helliker*, 463 F.3d at 876 (same); *Qwest Corp. v. City of Surprise*, 434 F.3d 1176, 1181 (9th Cir. 2006) (same). For example, SB 338 fails to remedy Appellees' concern with SB 223's shortened limitations period. While the new law expands the period from one to two years, that is still short of the three-to-four-year pre-SB 223 period Appellees argued was required to prevent "an irreconcilable conflict with standard auditing practices authorized by ERISA."

Further, SB 338 includes two notice provisions that are similar to the notice provisions Appellees challenged in SB 223. While no longer expressly identifying ERISA plans, SB 338 § 4 still requires claimants—including ERISA trusts—to issue notices to contractors for any claims of indebtedness. It also requires contractors to notify claimants of new projects.**[11]** These provisions track the delinquency

---

**[11]** SB 338 § 4 provides that

> 1. *Any potential claimant* to indebtedness for labor under NRS 608.150 shall, within 90 days after receiving the *written request* described in subsection 2, *provide to the original contractor*, subcontractor or other contractor who submitted the written request a *written notice* that includes, without limitation:
>
> (a) Any claim that is asserted under this section;
>
> (b) The basis for any such claim; and
>
> (c) Either:

(SB 223 § 5) and commencement (SB 223 § 4(7)) notice provisions of SB 223.  Appellees argued in their merits brief on appeal that state imposition of these administrative burdens was preempted because they "frustrate ERISA's goal of nationwide uniformity by requiring benefit plans to adopt Nevada-specific practices."  The district court agreed, concluding that "even if SB[]223 did not expressly refer to employee benefit plans it has a 'connection with' such plans . . . ." *Chambers*, 168 F. Supp. 3d at 1324.

---

(1) The amount of any such claim;

(2) An explanation of what data is needed to calculate the amount of any such claim; or

(3) A statement that no amount is due under any such claim.

2. The *written request* required pursuant to subsection 1 must:

(a) Be submitted by an original contractor, subcontractor or other contractor;

(b) Be directed to the claimant described in subsection 1; and (c) Identify the:

(1) Original contractor, subcontractor or other contractor;

(2) *Dates that work commenced and ended or is expected to end*; and

(3) Nature and location of any project to which the contract applies.

SB 338 § 4 (emphasis added).

SB 338 § 4 does not address Appellees' or the district court's concerns and Appellees do not assert in their motion to dismiss this appeal that SB 338 resolves them. Instead, they acknowledge only that the "language about which Appellees complained [in SB 223] has been removed from Nevada's statutes," and that SB 223 has been "*altered* by the enactment of SB 338," and otherwise "*change[d]*." Such anodyne descriptions of an undisputed revision to the law fall short of asserting that the *legal issue*—preemption—has been *resolved*. *Cf. Maldonado*, 556 F.3d at 1042; *Helliker*, 463 F.3d at 876; *Qwest*, 434 F.3d at 1181. Indeed, while SB 338 is not before us in this appeal, the fact that its provisions revive some of the challenged aspects of the now-repealed law is *prima facie* evidence that Nevada has not met its burden of demonstrating mootness. *See Assoc. General Contractors,* 508 U.S. at 661–62 (case not moot where new legislation retained some challenged aspects of repealed legislation); *see also City of Mesquite*, 455 U.S. at 289. Accordingly, we hold that the Nevada legislature's enactment of a statute that repeats some of the challenged aspects of SB 223 is conclusive evidence of its failure to show that it would not reenact any challenged part of SB 223. *See id.*

## III.

Having determined that the State's appeal is not moot, we turn to the merits. Appellees brought a facial challenge to SB 223 seeking a declaration that SB 223 is unconstitutional in all circumstances. Our review therefore focuses on whether SB 223 is *per se* unlawful. *Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 580 (1987).

We review the district court's grant of summary judgment de novo. *Asarco LLC v. Atl. Richfield Co.*, 866 F.3d 1108, 1118 (9th Cir. 2017). "[V]iewing the

evidence in the light most favorable to the nonmoving party," we must decide "whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Curly v. City of N. Las Vegas*, 772 F.3d 629, 631 (9th Cir. 2014). "We may affirm a grant of summary judgment on any ground supported by the record, even one not relied upon by the district court." *Id*.

## IV.

### A.

"Congress enacted ERISA, 'to promote the interests of employees and their beneficiaries in employee benefit plans' and to 'eliminate the threat of conflicting or inconsistent State and local regulation of employee benefit plans.'" *Operating Eng'rs Health & Welfare Trust Fund v. JWJ Contracting Co.*, 135 F.3d 671, 676 (9th Cir. 1998) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983)). To that end, Congress included an express preemption provision providing that "ERISA 'supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . .'"[12]  *Id.* (quoting ERISA § 514(a), 29 U.S.C. § 1144(a)).

ERISA's preemptive scope is nearly all-encompassing if read literally. The Supreme Court has observed that "[i]f 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption

---

[12] The term "employee welfare benefit plan" is broadly defined to mean "any plan, fund, or program . . . established or maintained by an employer or by an employee organization . . . for the purpose of providing for its participants or their beneficiaries" various health and other benefits.  29 U.S.C. § 1002(1).

would never run its course." *Travelers*, 514 U.S. at 655. Such is a result "no sensible person could have intended." *Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 336 (1997) (Scalia, J., concurring). Thus, "the need for workable standards has led the Court to reject 'uncritical literalism' in applying the clause." *Gobeille*, 136 S. Ct. at 943 (2016) (quoting *Travelers*, 514 U.S. at 656).

Understanding the current state of ERISA preemption law requires some historical context. At one time the Court gave the term "relate to" "expansive" effect. *Gobeille*, 136 S. Ct. at 943; *Dist. of Columbia v. Greater Wash. Bd. of Trade*, 506 U.S. 125, 129 (1992) (citing Black's Law Dictionary 1288 (6th ed. 1990)). Because "everything is related to everything else," such a literal interpretation risked snaring a host of state laws that did not target ERISA's field of federal concern. *See Dillingham*, 519 U.S. at 335 (Scalia, J., concurring). Under that approach, a "state statute's express reference to ERISA plans suffic[ed] to bring it within the federal law's pre-emptive reach." *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 830 (1988). Moreover, a state law was preempted "'even if the law [wa]s not specifically designed to affect [ERISA] plans, or the effect [wa]s only indirect.'" *Greater Wash.*, 506 U.S. at 130 (quoting *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 139 (1990)).

Since *Greater Washington*, the Supreme Court has narrowed ERISA's preemptive reach, as we have recognized. *Golden Gate Restaurant Ass'n v. City and Cnty. of San Francisco*, 546 F.3d 639, 654 (9th Cir. 2008) ("We read *Travelers* as narrowing the Court's interpretation of the scope of § 514(a)."); *S. Cal. IBEW-NECA Trust Funds v. Standard Indus. Elec. Co.*, 247 F.3d 920, 925 (9th Cir. 2001)

("Since the Supreme Court narrowed the scope of ERISA preemption in *Travelers* . . . ."). Instead of interpreting "relate to" literally, the Court has incorporated general principles of preemption analysis. *See Travelers*, 514 U.S. at 654–55; *John Hancock Mut. Life Ins. Co. v. Harris Trust and Sav. Bank*, 510 U.S. 86, 99 (1993); *Boggs*, 520 U.S. at 841.

First, the Court has applied the presumption that a state law directed at an area of traditional state concern is not preempted. *Travelers*, 514 U.S. at 654–55. Relying on preemption cases outside the ERISA context, the Court has explained that "where federal law is said to bar state action in fields of traditional state regulation," "the 'assumption [is] that the historic police powers of the States [are] not to be superseded by the Federal Act unless that [i]s the clear and manifest purpose of Congress.'" *Id.* at 655 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)); *see also Golden Gate*, 546 F.3d at 647–48. Indeed, we have observed that "the Court has come to recognize that ERISA pre-emption must have limits when it enters areas traditionally left to state regulation." *JWJ*, 135 F.3d at 677.

Second, the Supreme Court has incorporated principles of field and conflict preemption. *See John Hancock*, 510 U.S. at 99 ("discern[ing] no solid basis for believing that Congress, when it designed ERISA, intended fundamentally to alter traditional preemption analysis"). Courts assess whether the state "'law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress,'" or targets a "field[] of traditional state regulation." *Id.* (quoting *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984)); *Egelhoff v. Egelhoff*, 532 U.S. 141, 150 (2001) (invalidating a law that "directly conflicts with ERISA's requirements"); *Boggs*, 520 U.S. at 841

(assessing whether "state law conflicts with the provisions of ERISA or operates to frustrate its objects"); *Travelers*, 514 U.S. at 655.

Whether a state law targets a "field[] of traditional state regulation," *see Travelers*, 514 U.S. at 655, is a quintessential field preemption inquiry, and whether it "stands as an obstacle" to ERISA's "purposes and objectives," *see John Hancock*, 510 U.S. at 99, speaks to conflict preemption. *See Dillingham*, 519 U.S. at 336 (Scalia, J., concurring) (opining that "the 'relate to' clause of the pre-emption provision is meant, not to set forth a *test* for pre-emption, but rather to identify the field in which ordinary *field pre-emption* applies—namely, the field of laws regulating 'employee benefit plan[s] described in section 1003(a) of this title and not exempt under section 1003(b) of this title'" (quoting 29 U.S.C. § 1144(a)). As Justice Scalia explained, a contrary approach would read out of ERISA's preemption provision any limitation on its scope: "if [the preemption provision] is interpreted to be anything other than a reference to our established jurisprudence concerning conflict and field pre-emption[,] [it] has no discernible content that would not pick up every ripple in the pond." *Egelhoff*, 532 U.S. at 153 (Scalia, J., concurring); *accord Egelhoff*, 532 U.S. at 153 (Breyer, J., dissenting) (explaining that the Court's "more recent ERISA cases are consistent with" an "approach" of "apply[ing] normal conflict pre-emption and field pre-emption principles").

Accordingly, under the modern approach a state law is not preempted merely because it has a literal "connection with" an ERISA plan. *Cf. Greater Washington*, 506 U.S. at 129–30. Instead, the law must actually "'*govern[]* . . . a central matter of plan administration' or '*interfere*[] with

nationally uniform plan administration.'"[13]  *Gobeille*, 136 S.
Ct. at 943 (emphasis added) (quoting *Egelhoff*, 532 U.S. at
148).  Similarly, a state law is no longer preempted simply
because it makes literal "reference to" an ERISA plan.  *Cf.
Greater Washington*, 506 U.S. at 130.  Instead, it must both
identify ERISA plans and "'*act[]* immediately and
exclusively *upon* ERISA plans'" or make "'the existence of
ERISA plans . . . essential to the law's operation.'"
*Gobeille*, 136 S. Ct. at 943 (emphasis added) (quoting
*Dillingham*, 519 U.S. at 325).  And because, under a field
preemption analysis ERISA preemption extends only to the
limits of ERISA's regulatory domain, a state law does not
impermissibly "act[] upon" an ERISA plan if it targets an
area of traditional state concern, unless it poses an obstacle
to ERISA's objectives or invades the federal field.  *See
Travelers*, 514 U.S. at 655, 661 ("nothing in the language of
[ERISA] or the context of its passage indicates that Congress
chose to displace general healthcare regulation, which
historically has been a matter of local concern"); *Egelhoff*,
532 U.S. at 151–52; *Egelhoff*, 532 U.S. at 152–53 (Scalia, J.,
concurring).

Having set forth the pertinent analytical framework, we
turn to the scope of ERISA's regulation of ERISA plans to
determine the extent of the federal field.  An ERISA "plan"
is a "set of rules that define the rights of a beneficiary and
provide for their enforcement.  Rules governing collection
of premiums, definition of benefits, submission of claims,

---

[13] A state law also has an impermissible "connection with" ERISA
plans if "'acute, albeit indirect, economic effects' of the state law 'force
an ERISA plan to adopt a certain scheme of substantive coverage or
effectively restrict its choice of insurers.'"  *Gobeille*, 136 S. Ct. at 943
(quoting *Travelers*, 514 U.S. at 668).  That basis for preemption is not
implicated in this case.

and resolution of disagreements over entitlement to services are the sorts of provisions that constitute a plan." *Pegram v. Herdrich*, 530 U.S. 211, 223 (2000). To those ends, federal regulation of ERISA plans covers four main areas: a plan's fiduciary obligations to plan members, and reporting, disclosure, and recordkeeping requirements. *Gobeille*, 136 S. Ct. at 944; *Travelers*, 514 U.S. at 650, 661. Plans must "file an annual report with the Secretary of Labor" detailing a "financial statement listing assets and liabilities . . . and . . . receipts and disbursements of funds." *Gobeille*, 136 S. Ct. at 944. They must also "keep detailed records so compliance with ERISA's reporting and disclosure requirements may be 'verified, explained, or clarified, and checked for accuracy and completeness.'" *Id.* at 944–45 (quoting 29 U.S.C. § 1027). If a state law encroaches on these areas of federal concern, it is preempted. Conversely, state laws that do not target these ERISA functions, nor "regulate[] a key fact of plan administration," are likely not preempted. *See Travelers*, 614 U.S. at 655; *Egelhoff*, 532 U.S. at 151–52; *Egelhoff*, 532 U.S. at 152–53 (Scalia, J., concurring); *Rutledge v. Seyfarth, Shaw, Fairweather & Geraldson*, 201 F.3d 1212, 1217 (9th Cir. 2000).

We proceed next to determine whether the presumption against preemption applies to SB 223. Because we conclude that the answer is "yes", we then must determine whether that presumption is rebutted by a showing that SB 223 targets ERISA's field of federal concern or poses an obstacle to ERISA's objectives.

## B.

Debt collection is an area of traditional state regulation, and so the presumption against preemption applies to state laws regulating such activities. *See Mackey*, 486 U.S. at 834; *Travelers*, 514 U.S. at 654–55. Indeed, "state-law methods

for collecting money judgments must, as a general matter, remain undisturbed by ERISA." *Id.*; *see also JWJ*, 135 F.3d at 678 (state bonding law allowing ERISA trusts to enforce payment bonds against employers' sureties was not preempted because the law "regulate[d] in an area that Congress has traditionally left to the states"). Nevada has regulated the particular type of debt collection practice here—vicarious liability for construction debts—since the 1930s.

SB 223 modified Nevada's vicarious liability statute, Nev. Rev. Stat. § 608.150, with six amendments. Taken together, the amendments limited general contractors' vicarious liability for subcontractors' debts, while expanding information sharing to reduce the risk of delinquencies in the first place. SB 223's various components are therefore all of a piece regulating the exposure of general contractors—who are not parties to ERISA plans—to vicarious liability for subcontractors' debts. And because debt collection is a traditional state function, the presumption against preemption applies. Accordingly, we will deem SB 223 preempted only if it plainly regulates in the "areas with which ERISA is expressly concerned—reporting, disclosure, fiduciary responsibility, and the like," *Dillingham*, 519 U.S. at 330 (internal quotation marks omitted), "regulates a key facet of plan administration," *Gobeille*, 136 S. Ct. at 946, or poses an obstacle to the accomplishment of ERISA's objectives, *John Hancock*, 510 U.S. at 99.

## C.

Appellees attack SB 223 on several fronts. First, they argue that because debt collection is part of ERISA trusts' fiduciary obligations to employee members, SB 223 intrudes on a key ERISA function. From this premise Appellees

reason that SB 223 governs a central matter of plan administration and therefore has an impermissible "connection with" ERISA plans. Second, and relatedly, Appellees assert that SB 223 acts exclusively on ERISA plans by repeatedly singling out health or welfare funds and the like, thereby making an impermissible "reference to" ERISA plans. Third, Appellees refute the State's assertion that regulation of ERISA *trusts* is not coterminous with regulation of ERISA *plans*, only the latter of which is subject to ERISA preemption.[14]

### D.

We turn our attention to assessing whether SB 223 transgresses any of the factors governing ERISA preemption. Under the first factor, ERISA preempts SB 223 if it has an "impermissible *connection with* ERISA *plans*, meaning a state law that governs . . . a central matter of plan administration or interferes with nationally uniform plan administration." *Gobeille*, 136 S. Ct. at 943 (internal quotation marks omitted) (emphasis added). Appellees insist that SB 223 regulates ERISA plans by targeting debt collection, which they assert is a "facet of plan administration." *See Gobeille*, 136 S. Ct. at 946.

Appellees' assertion rests on a flawed premise: that regulations affecting ERISA plan administrators are, *ipso facto*, regulations of ERISA plans themselves. We long ago rejected this conflation. In *Lane v. Goren*, 743 F.2d 1337, 1338–39 (9th Cir. 1984), an ERISA trust challenged a state

---

[14] This argument is essentially a repackaging of Appellees' first contention: because debt collection is one way that ERISA trusts execute their fiduciary obligations, and because ERISA plans are administered by the trusts, Appellees reason there exists no meaningful distinction between trusts and plans.

law prohibiting employment discrimination by, among other entities, ERISA trusts. A former trust employee brought an action alleging unlawful termination under state law, and the trust defended on the ground that the law was preempted by ERISA. *Id.* at 1339. The trust argued that the law "will affect [its] benefit plan by increasing [its] cost of doing business"—presumably by requiring it to pay damages to aggrieved employees—and thereby affected its fiduciary duty to manage plan funds. *See id.* at 1340. We rejected the trust's argument, explaining that to be preempted, a state law must "reach in one way or another the 'terms and conditions of employee benefit plans.'" *Id.* at 1339 (quoting 29 U.S.C. § 1144(c)(2)). The law in *Goren* did not cross that line because it regulated ERISA trusts as employers, not the plans they administered. *Id.* at 1339–41.

Similarly, in *JWJ*, we explained that even in the pre-*Travelers* era, the inquiry was:

> Is the state telling employees how to write their ERISA plans, or conditioning some requirement on how they write their ERISA plans? Or is it telling them that regardless of how they write their ERISA plans, they must do something else outside and independently of the ERISA plans? If the latter . . . there is no preemption.

*JWJ*, 135 F.3d at 679 (internal quotation marks omitted).

We conducted a similar analysis in *Southern California IBEW-NECA*. There, we assessed whether ERISA preempted a California law allowing ERISA trusts to collect money owed for work performed through stop notice and payment bond remedies. 247 F.3d at 923. While the law gave ERISA trusts a tool to satisfy their fiduciary obligation

to employees—an area of federal concern under ERISA—we held that it was not preempted because it did not invade any area of federal regulation of ERISA plans. *See id.* at 925. We found determinative that the bond remedy

> does not require the establishment of a separate benefit plan, and imposes no new reporting, disclosure, funding, or vesting requirements for ERISA plans. California's statute similarly does not tell employers how to write ERISA benefit plans or how to determine ERISA beneficiary status, and does not condition requirements on how ERISA benefit plans are written.

*Id.* The law in *Southern California IBEW-NECA* is strikingly similar to SB 223 in relevant part. Both implicate ERISA plans' fiduciary obligations, but neither targets the type of "reporting, disclosure, funding, or vesting requirements" regulated by ERISA, interferes with the terms of an ERISA plan, or otherwise "regulates a key facet of plan administration." *See id.*; *Gobeille*, 136 S. Ct. at 946.

*Mackey*, a case relied upon by the district court and Appellees, further supports this distinction. There, the Supreme Court expressly rejected a claim of preemption against a generally applicable state garnishment law that undercut ERISA trusts' ability to maximize member benefits. 486 U.S. at 831–32. The Court reasoned that "Congress did not intend to forbid the use of state-law mechanisms of executing judgments against ERISA welfare benefit plans, *even when those mechanisms prevent plan participants from receiving their benefits.*" *Id.* (emphasis added). The Court explained that, notwithstanding that the state law "obviously affect[ed] and involve[ed] ERISA plans

and their trustees," that was of no moment because the type of action—a "run-of-the-mill state-law claim[]"—was a typical "state-law method[] for collecting money judgments" left unregulated by ERISA. *Id.* at 833–34. In sum, *Goren*, *JWJ*, *Southern California IBEW-NECA*, and *Mackey* stand for the proposition that if a state law regulates or affects plan administrators in a way that falls outside ERISA's regulatory reach, it does not have an impermissible "connection with" ERISA plans.

In contrast, where courts have found an impermissible "connection with" an ERISA plan, the state law operated directly on an aspect of plan administration regulated by ERISA. In *Gobeille*, the Court addressed a Vermont law "requiring disclosure of payments [by ERISA plans] relating to health care claims and other information relating to health care services." 136 S. Ct. at 940. In so doing, the law targeted ERISA plan recordkeeping and reporting requirements. *Id.* at 945. Because ERISA regulates those same requirements, the Court found that the law "intrude[d] upon 'a central matter of plan administration' and 'interfere[d] with nationally uniform plan administration.'" *Id.* (quoting *Egelhoff*, 532 U.S. at 148). The law therefore amounted to "a *direct* regulation of a fundamental ERISA function" and was preempted. *Id.* at 946 (emphasis added).

Similarly, in *Shaw*, the Court deemed preempted a New York law that "prohibit[ed] employers from structuring their employee benefit plans in a manner that discriminates on the basis of pregnancy, and [New York's] Disability Benefits Law, which requires employers to pay employees specific benefits." 463 U.S. at 97. And in *FMC Corp. v. Holliday*, 498 U.S. 52, 60 (1990), the Court struck down a Pennsylvania law that "prohibit[ed] plans from being structured in a manner requiring reimbursement in the event

of recovery from a third party" and also "require[d] plan providers to calculate benefit levels" based on a specified formula.

The laws in *Shaw* and *FMC Corp.* were preempted because they "'mandated employee benefit structures or their administration'"—i.e., they regulated the core operations of the plans themselves. *See Dillingham*, 519 U.S. at 328 (quoting *Travelers*, 514 U.S. at 658). Put another way, the laws impermissibly "t[old] employers how to write ERISA benefit plans" or otherwise imposed "State . . . regulation of employee benefit plans." *Shaw*, 463 U.S. at 99 (internal quotation marks omitted); *S. Cal. IBEW-NECA*, 247 F.3d at 925. SB 223 does neither of these things. Instead, it targets ERISA plans' debt collection practices by defining the circumstances under which third party general contractors may be held vicariously liable for subcontractors' debts. SB 223 neither invades the federal field occupied by ERISA nor poses an obstacle to ERISA's goal of national uniformity in plan administration.

SB 223 also lacks a "connection with" ERISA plans for a more fundamental reason: holding otherwise would constitutionalize a state entitlement that Nevada was under no obligation to provide in the first place. Appellees argue that Nevada is precluded from limiting their rights under Nevada's vicarious liability law, but they fail to appreciate that SB 223 trims a state-conferred entitlement rather than infringes an ERISA-guaranteed right.[15] Appellees

---

[15] Appellees suggest that one of SB 223's damages provisions (§ 1(2)) disallows the types of damages guaranteed by ERISA—namely, interest, liquidated damages, attorney's fees, and costs. *See* 29 U.S.C. § 1132(g)(2). But § 1132(g)(2) and its companion provision, § 1145, apply to actions against employers who are "obligated to make

essentially view vicarious liability as a one-way ratchet: because Nevada offers them an entitlement today, it would be unconstitutional for Nevada to take it away tomorrow. That is not the law. States do not forfeit their authority over matters of traditional state concern by exercising that power in the first place.

* * *

SB 223 does not "govern[] . . . a central matter of plan administration," "interfere[] with nationally uniform plan administration," or target the types of "reporting, disclosure, [and] fiduciary responsibilit[ies]" regulated by ERISA. *See Gobeille*, 136 S. Ct. at 943 (internal quotation marks omitted); *Dillingham*, 519 U.S. at 330 (internal quotation marks omitted). Instead, it targets an area of traditional state concern—debt collection practices. The presumption against preemption therefore applies. And because regulating the vicarious liability of third party general contractors does not target any aspect of the federal field occupied by ERISA nor poses an obstacle to ERISA's objectives, SB 223 does not have an impermissible "connection with" ERISA plans and is not preempted on this theory.

### E.

Appellees may yet prevail if SB 223 makes an impermissible "reference to" ERISA plans by "act[ing]

---

contributions to a multiemployer plan"—i.e., subcontractors who are parties to ERISA plans. *Id.* §§ 1145, 1132(g)(2). These provisions do not purport to regulate recovery against *third parties* in actions brought under *state* law. The limited nature of the federal guarantee bolsters our conclusion that actions against non-parties to an ERISA plan brought under state vicarious liability law fall outside ERISA's regulatory field.

immediately and exclusively upon ERISA plans." *Gobeille*, 136 S. Ct. at 943 (internal quotation marks omitted). Of the six amendments under SB 223, four mention ERISA plans: the commencement notice (§ 4(7)), pre-lien notice (§ 4(8)), delinquency notice (§ 5), and one of the damages (§ 1(2)) amendments. Recall that § 1(2) limits vicarious liability for general contractors by excluding damages in the form of, among other things, attorney's fees; § 4(7) imposes a notice requirement on contractors when they commence a project; § 4(8) requires ERISA trusts to provide notice of a right to lien against general contractors; and § 5 requires ERISA administrators to notify a general contractor of a delinquency by a subcontractor party to an ERISA plan within 60 days.

### i.

That these four amendments mention ERISA plans is not determinative of preemption in the post-*John Hancock*, post-*Travelers* era. In fact, "[t]he Supreme Court . . . has never found a statute to be preempted simply because its text included the word ERISA or explicitly mentioned a covered employee welfare benefit plan." *WSB Elec., Inc. v. Curry*, 88 F.3d 788, 793 (9th Cir. 1996); *see also NYS Health Maint. Org. Conference v. Curiale*, 64 F.3d 794, 799–800 (2d Cir. 1995) (holding that a state law does not make an impermissible "reference to" an ERISA plan if it "merely 'make[s] mention' or 'allude[s]' to ERISA plans"); *Thiokol Corp. v. Roberts*, 76 F.3d 751, 759–60 (6th Cir. 1996) (same). "Rather than focusing on the text of the statute, we . . . look at how it actually operates." *S. Cal. IBEW-NECA*, 247 F.3d at 929. As explained in Part IV.A, *supra*, under the Court's modern approach to ERISA preemption, a state law impermissibly "acts upon" an ERISA plan only if it "mentions or alludes to ERISA plans, *and* has some effect on the referenced plans," *WSB Elec.*, 88 F.3d at 793

(emphasis in original), by encroaching on an area of federal regulation, *see Travelers*, 514 U.S. at 654–55; *John Hancock*, 510 U.S. at 99. A state law that merely mentions an ERISA plan but whose regulatory focus avoids ERISA plans' rights or duties under federal law is, by contrast, not preempted. *See Travelers*, 514 U.S. at 654–55; *WSB Elec.*, 88 F.3d at 793.

## ii.

Of the four amendments that mention ERISA plans, Appellees' arguments regarding §§ 1(2) and 4(7) are easily dispatched. Section 1(2) mentions ERISA plans but does not do so "exclusively," as is required for the provision to make an impermissible "reference to" those plans. *Gobeille*, 136 S. Ct. at 943. Indeed, § 1(2) mentions ERISA plans *inclusive* of "any other law or agreement" or "any other plan for the benefit of employees" under which a subcontractor may incur labor indebtedness.[16]

Section 1(2) is not preempted for an additional and related reason: it does not "act upon" ERISA plans. Its focus is elsewhere—namely, the scope of general contractors' vicarious liability. *See WSB Elec.*, 88 F.3d at 793 (state prevailing wage law not preempted where it referenced ERISA plans in furtherance of regulating something else: employers' ability to take a wage credit for contributions made to ERISA plans).

---

[16] To be sure, the *pre-amendment* version of the other damages provision, § 3(2), also mentions ERISA plans, but the amendment itself does not, and Appellees do not challenge the pre-SB 223 version of the law. Even if they did, § 3(2) references "express trust fund[s]" *inclusive* of any other entity to which an employee's compensation must be paid, including laborers themselves.

Section § 4(7) similarly does not target ERISA plans. Instead, it regulates contractors. The amendment provides that a contractor who "participat[es] in a health or welfare fund or any other plan for the benefit of employees is required to notify such fund or plan of the name and location of the project so that the fund or plan may protect potential lien rights under [Nevada law]." In so doing, § 4(7) indirectly *affects* ERISA plans, which are on the receiving end of the notice contractors must provide, but it steers clear of regulating the plans themselves. *See id.* Indeed, § 4(7) imposes no obligations on ERISA plans to do anything with the information they receive from contractors.

Sections 4(8) and 5 present a closer question because they expressly identify ERISA plans *and* apply directly to the trusts that administer them. Section 4(8) provides that, should a trust seek to hold a general contractor vicariously liable for subcontractor debts, it must first give notice to the contractor that it has an interest in a project. And § 5 conditions future actions for vicarious liability on a trust's prior timely notification of a delinquency. But while a state law's mention of ERISA plans may be probative that it "acts upon" those plans, it is not conclusive. The pertinent inquiry focuses instead on "how [the law] actually operates." *S. Cal. IBEW-NECA*, 247 F.3d at 929; *WSB Elec.*, 88 F.3d at 793; *Thiokol*, 76 F.3d at 759; *NYS Health Maint.*, 64 F.3d at 799–800. Indeed, while §§ 4(8) and 5 identify ERISA plans, their target is an area of traditional state concern: debt collection practices by plan administrators. Further, the amendments avoid the federal field occupied by ERISA. They do not "reach in one way or another the 'terms and conditions of employee benefit plans," *Goren*, 743 F.2d at 1339 (quoting 29 U.S.C. § 1144(c)(2)), nor regulate "reporting, disclosure, and recordkeeping requirements for welfare benefit plans," *Gobeille*, 136 S. Ct. at 944, nor affect the scope and contours

of the trusts' fiduciary obligations to manage plan funds in the interests of employees, *Travelers*, 514 U.S. at 650, 661.

Put another way, if Nevada were to scrap its vicarious liability statute root and branch, leaving Appellees with no recourse at all against general contractors, federal regulation of ERISA plans would be unaffected. The plans would have the same "reporting, disclosure, and recordkeeping requirements" as before, the same "terms and conditions" as before, and the same fiduciary obligations as before. Nothing would change except that Appellees would no longer enjoy a state-conferred entitlement to collect debts from third parties who are not signatories to an ERISA plan. As we have previously explained, "a statute 'refers to' an ERISA plan and is preempted if it mentions or alludes to ERISA plans, *and* has some effect on the referenced plans." *WSB Elec.*, 88 F.3d at 793 (emphasis in original); *see also Thiokol*, 76 F.3d at 760 ("a statute that refers to a[n] [ERISA] plan but does not attempt to affect such a plan should not be pre-empted"); *cf.* 29 U.S.C. §§ 1132(g)(2); 1145 (establishing a federal right to collect debts from *parties* to an ERISA plan, but saying nothing about a right to collect from third parties that are not "obligated to make contributions to a multiemployer plan").

Section 4(8) is not preempted for an additional reason. That amendment provides that ERISA plans are subject to the same pre-lien notice requirements as other entities and individuals who are not on-site workers. Before SB 223's enactment on-site workers and ERISA plans were exempt from the pre-lien notice requirement, but engineers, machinists, architects, and others involved in a project were not. *Hartford Fire Ins.*, 578 F.3d at 1128 (citing *Hartford Fire Ins. Co. v. Trs. of Constr. Indus.*, 208 P.3d 884, 886 (Nev. 2009)). Singling out ERISA plans under SB 223 was

therefore necessary to effectuate a policy that *equalizes* the notice requirement across all those who are not actually laying foundations and stacking bricks.  With SB 223, Nevada's vicarious liability law no longer "exclusively" exempts ERISA plans.  *See Gobeille*, 136 S. Ct. at 943 (law impermissibly makes "reference to" an ERISA plan if it "acts . . . *exclusively* upon ERISA plans" (emphasis added)).  It therefore *rectifies* an aspect of Nevada's vicarious liability law that *had* applied "exclusively" to ERISA plans.

Finally, the existence of ERISA plans is not "essential to [SB 223's] operation"—another basis for discerning an impermissible "reference to" ERISA plans.  *Gobeille*, 136 S. Ct. at 943.  The law operates to limit general contractors' vicarious liability.  SB 223 §§ 1(2) & 3(2).  Those limits apply regardless of whether ERISA trusts, workers, or the State brings an action under Nev. Rev. Stat. § 608.150 to recover subcontractors' debts.  *See, e.g.*, *Lemus v. Burnham Painting & Drywall Corp.*, No. 2:06-CV-1158-RCJ-PAL, 2007 WL 2669772, at *1–2 (D. Nev. Sept. 4, 2007) (example of workers bringing suit against a general contractor under Nev. Rev. Stat. § 608.150).  And while §§ 4(8) and 5 specifically identify ERISA plans, those provisions are not necessary to the operation of SB 223's limitation on damages in actions brought by entities other than ERISA trusts.  Accordingly, on the dispositive question of whether SB 223 would still have an effect in the absence of ERISA plans, the answer is unequivocally "yes".

### iii.

Appellees' reliance on two cases, *Mackey* and *Greater Washington*, is misguided.  Earlier in this opinion we discussed *Mackey*'s holding that a generally applicable Georgia garnishment statute was not preempted.  But *Mackey* also held that a related state garnishment statute that

applied *exclusively* to ERISA plans *was* preempted. *Mackey*, 486 U.S. at 830. That law barred garnishment of "funds or benefits of an . . . employee benefit plan or program subject to . . . ERISA." *Id.* at 828 (internal quotation marks and adjustments omitted). The Court observed that the law "expressly refer[red] to—indeed solely applie[d] to— ERISA employee benefit plans." *Id.* at 829. Viewing this statement in isolation it appears that preemption resulted from the mere mention of ERISA plans. But the Court also found that the law "relate[d] to" ERISA plans because it was "specifically designed to *affect* employee benefit plans." *Id.* (internal quotation marks omitted) (emphasis added).

Appellees also look to *Greater Washington* for support. There, the Court invalidated a District of Columbia law requiring employers who provided health insurance coverage through ERISA benefit plans to also provide that coverage if an employee was receiving workers' compensation benefits. 506 U.S. at 128–30. Thus, like the law in *Mackey*, the District of Columbia statute attempted to overlay state regulation onto a feature of plan administration. SB 223, by contrast, targets no aspect of plan administration.

To be sure, *Mackey* and *Greater Washington* deploy sweeping language suggesting that a state law need only mention an ERISA plan to be preempted. For example, *Greater Washington* states that the District's law "specifically refers to welfare benefit plans regulated by ERISA and on that basis alone is pre-empted." *Id.* at 130. To the extent those decisions articulate a capacious view of ERISA preemption, it is doubtful they remain good law in the post-*John Hancock*, post-*Travelers* era. We instead look to the Court's and our own more recent precedent in discerning the parameters of an impermissible "refer[ence] to" ERISA plans.

Indeed, our circuit's case law compels the conclusion that SB 223's amendments do not make an impermissible "reference to" ERISA plans. In *WSB Electric*, we considered whether a California prevailing wage law that made literal reference to ERISA plans was preempted. 88 F.3d at 792–93. The law required employers to pay a specified minimum wage, which could be satisfied through a mix of cash payments and benefits contributions. *Id.* at 791. But it also allowed employers to take a credit for benefits contributions—including those made to ERISA plans—up to a specified amount. *Id.* If they contributed "excess" benefits, they still could not take a credit for anything over the statutory minimum. *Id.* The question presented was whether the law made "reference to" ERISA plans. *Id.* at 793.

We began our analysis by observing that wage regulation is "a subject of traditional state concern," and is not "included in ERISA's definition of 'employee benefit plan.'" *Id.* at 791. Addressing whether the law nevertheless made an impermissible "reference to" ERISA plans, we held it did not:

> The references to ERISA plans in the California prevailing wage law have no effect on any ERISA plans, but simply take them into account when calculating the cash wage that must be paid. At most, this scheme provides examples of the types of employer contributions to benefits that are included in the wage calculation. *The scheme does not force employers to provide any particular employee benefits or plans, to alter their existing plans, or to even provide ERISA plans or employee benefits at all.*

*Id.* at 793 (emphasis added).  In other words, while the law referenced payments to ERISA plans specifically as a means of satisfying an employer's prevailing wage obligation, it did not "act[] . . . upon ERISA plans" themselves.  *See id.*; *see also Thiokol*, 76 F.3d at 755, 759–60 (tax law that referenced ERISA plans was not preempted, in part because it targeted employers, not ERISA plans).

Nor did the law in *WSB Electric* "act upon" ERISA plans by incidentally impacting plan funds.  We explained that the law's cap on the amount of ERISA plan benefit contributions employers could "credit" toward the prevailing wage requirement would likely induce employers to "adjust their contributions downward to reflect the prevailing rate.  In that case, the prevailing wage law would have an incidental impact on ERISA plans."  *Id.* at 795.  But such effects did not mean preemption because, on the determinative question of whether the law "acted upon" the plans, the law's aim was elsewhere—namely, employers and their obligation to pay employees a prevailing wage.  *See id.* at 793, 795.

Similarly, in *Golden Gate*, we upheld a local ordinance providing that, if employers made benefits contributions to ERISA plans, they were required to make certain minimum payments to those plans.  *Id.* at 645–47.  We held that the ordinance did not make an impermissible "reference to" ERISA plans because its target was not any aspect of plan administration regulated by federal law.  *See id.* at 659 ("if [employers] have such a[n ERISA] plan, they need not make any changes to it").  The law did not regulate benefits owed employees under the plan, conflict with any reporting or recordkeeping requirements under ERISA, or interfere with management of plan funds.  Instead, it regulated employers—specifically, their payments *to* ERISA plans. *Id.* at 658.

Like the wage regulation in *WSB Electric*, §§ 4(8) and 5 target an area of traditional state concern—debt collection—that is "not within ERISA's coverage." *See WSB Elec.*, 88 F.3d at 791. And also like the law at issue there, SB 223's references to ERISA plans do not work a regulation of any aspect of the federal field. SB 223 does not "force employers to . . . alter their existing plans" or otherwise "reach in one way or another the 'terms and conditions of employee benefit plans.'" *Id.* at 793; *Goren*, 743 F.2d at 1339 (quoting 29 U.S.C. § 1144(c)(2)).

Further, SB 223 is more attenuated to ERISA plans than the ordinance in *Golden Gate*, which regulated contribution payments to ERISA plans—an undeniable aspect of plan administration. 546 F.3d at 646–47, 658. SB 223, by contrast, avoids any aspect of the collection, management, or distribution of plan funds. Instead, it regulates a state device that ERISA trusts can enlist in their efforts to responsibly manage funds for plan members.

*     *     *

Four of SB 223's six amendments make literal reference to ERISA plans, but none "[a]ffect . . . the referenced plans" by regulating any aspect of plan administration or the plans themselves. *See WSB Elec.*, 88 F.3d at 793. Instead, SB 223 avoids ERISA's regulatory domain entirely, and instead pares back a state entitlement holding third party general contractors liable for plan members' debts. Accordingly, none of SB 223's amendments "act upon" ERISA plans, and the law is not preempted on this theory.

## CONCLUSION

Appellees challenged SB 223 as preempted and the district court agreed. In response, the Nevada legislature

repealed SB 223 pending this appeal and replaced it with a new law. Because the legislature repealed SB 223 in response to an adverse judicial ruling, we deem the appeal moot only if Nevada demonstrates that it will not reenact the challenged law in whole or in part. Nevada fails to do so. Indeed, the law that replaced SB 223 incorporates several of the challenged components of the old law.

On the merits, SB 223 limits a state entitlement to hold third-party general contractors vicariously liable for the debts of ERISA plan members. Because SB 223 targets an area of traditional state regulation, the presumption against preemption applies. SB 223 is therefore only preempted if it invades the federal field regulated by ERISA or poses an obstacle to its objectives. SB 223 does neither of these things. Indeed, Appellees' obligations under ERISA remain exactly the same with or without SB 223. Thus, SB 223 has neither an impermissible "connection with" nor does it make an impermissible "refer[ence] to" ERISA plans. *Gobeille*, 136 S. Ct. at 943. Accordingly, we **VACATE** the district court's grant of summary judgment and **REMAND** for entry of judgment consistent with this opinion.[17]

Each side shall bear its own costs in this appeal.

---

[17] Because we hold SB 223 is not preempted, we do not reach the parties' dispute over whether SB 223 is severable.

WALLACE, Circuit Judge, dissenting:

I respectfully dissent. For the reasons that follow, I conclude the Nevada Legislature's repeal of SB 223, and its enactment of SB 338, moots this appeal.

I.

"We do not have the constitutional authority to decide moot cases." *Foster v. Carson*, 347 F.3d 742, 747 (9th Cir. 2003) (citation omitted). As a general rule, "a case is moot when the challenged statute is repealed, expires, or is amended to remove the challenged language." *Log Cabin Republicans v. United States*, 658 F.3d 1162, 1166 (9th Cir. 2011); *Chemical Producers & Distribs. Ass'n v. Helliker*, 463 F.3d 871, 878 (9th Cir. 2006) ("A statutory change . . . is usually enough to render a case moot, even if the legislature possesses the power to reenact the statute after the lawsuit is dismissed.") (citation omitted). The exceptions to this rule "are rare and typically involve situations where it is virtually certain that the repealed law will be reenacted." *Helliker*, 463 F.3d at 878 (quoting *Native Vill. of Noatak*, 38 F.3d 1505, 1510 (9th Cir. 1994)). This appeal does not present the "rare" exception.

Here, statutory change has rendered the case moot. In July 2015, the Nevada Legislature passed SB 223. In July 2017, the Legislature repealed SB 223 and replaced it with SB 338. Five of the six challenged SB 223 provisions have no analogue in the new SB 338—they were repealed entirely and that repeal was made retroactive to the enactment of SB 223. The sixth provision—SB 223's provision shortening the limitations period for actions against a general contractor to one year—was replaced with a new provision providing for a two-year limitations period. The result is a complete statutory overhaul by the Nevada Legislature—the law that

prompted Plaintiffs' preemption challenge is no longer on the books. Nor is there any indication the Legislature is "virtually certain," or even likely, to reenact SB 223. *Noatak*, 38 F.3d at 1510. Therefore, I conclude this case is moot under our *Noatak* line of cases, and that we have no power to reach the merits. *See Gator.com Corp. v. L.L. Bean, Inc.*, 398 F.3d 1125, 1132 (9th Cir. 2005) (en banc) ("While mootness analysis must . . . eschew undue formalism, it must nevertheless operate within the well-defined contours of Article III.").

## II.

The majority's conclusion that this case is not moot rests on a multipart argument that departs from our court's well-reasoned rule that statutory change is generally enough to render a case moot. To demonstrate why I believe the majority's conclusion is in error, I address the constituent elements of their argument in turn.

## A.

A central part of the majority's argument stems from their interpretation of the Supreme Court's decision in *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283 (1982). In *City of Mesquite*, the district court had ruled that a provision of the City's licensing ordinance was unconstitutionally vague. *Id.* at 287. While an appeal from that decision was pending, the City repealed the objectionable language. *Id.* at 288–89. Faced with the possibility the case was now moot, the Supreme Court concluded that although the objectionable language was no longer part of the ordinance, it nonetheless "*must* confront the merits of the vagueness holding." *Id.* at 289 (emphasis added). The Court explained that its obligation to reach the merits stemmed from the fact that the City's repeal of the

objectionable provision "would not preclude it from reenacting precisely the same provision if the District Court's judgement were vacated." *Id.*

The majority extracts the following rule from *City of Mesquite*: when a legislature changes a law but retains discretion to reenact the law after completion of the litigation, the case falls under the "voluntary cessation" exception to mootness, and the court should decide the merits of the repealed law's legality. Applying that rule here, the majority concludes that because vacatur would free the Nevada Legislature to reenact the now-repealed SB 223 in the future, the appeal is not moot. Maj. Opn. at 18–19.

But the majority draws the wrong lessons from *City of Mesquite*'s one paragraph mootness discussion. There, the City had a proven history of reenacting constitutionally suspect provisions once the shadow of adverse judicial rulings had lifted, and, in fact, had announced its intention to reenact the very provision at issue before the Court. *City of Mesquite*, 455 U.S. at 289 n.11. Thus, in *City of Mesquite* it was the City's blatant "repeal-reenact" gamesmanship that drove the Court's holding that repeal of the objectionable law did not moot the case. That limited exception does not exist here.

Here, there is no indication the Nevada Legislature intends to reenact the now-repealed SB 223. To do so would generally require, at minimum, drafting a new bill, passing the bill through the relevant committees, reading and debating the bill on the floor of both houses of the legislature, and voting on the bill. *See* Nevada Legislative Manual, 143 68 (Feb. 2017) https://www.leg.state.nv.us/Division/Research/publications/LegManual/2017/ (last visited Aug. 3, 2018). No such legislative action appears on the horizon, and there is no suggestion the Nevada Legislature

has a history of the type of "repeal-reenact" machinations engaged in by the city council in *City of Mesquite*. Therefore, absent evidence the Legislature intends to reenact the SB 223 provisions invalidated by the district court, the voluntary cessation exception to mootness applicable in *City of Mesquite* does not apply here. *See Helliker*, 463 F.3d at 878 (statutory amendment mooted the case where there was "no reason to think the California legislature enacted the amendment with a mind to restoring the old law later").

### B.

The second part of the majority's argument for why this case is not moot is that the decisions in our circuit holding that statutory change is usually enough to moot a case—namely, *Noatak*, *Helliker*, and *Log Cabin Republicans*—"flip" *City of Mesquite* on its head. Maj. Opn. at 24. According to the majority, *City of Mesquite* holds that statutory change only moots a case if there is "certainty" that the repealed law *will not* be reenacted, Maj. Opn. at 20, 24, while the line of cases upon which I rely advance the inverse proposition—that statutory change moots a case unless it is "virtually certain" the repealed law *will* be reenacted, *Noatak*, 38 F.3d at 1510.

I do not regard our circuit precedent in the *Noatak* line of cases as a departure from *City of Mesquite*. If anything, it is *City of Mesquite* that is *sui generis*. In *Noatak* itself, our court cited *City of Mesquite* as an exception to the general rule that statutory change moots a case based on the fact that the City was likely to reenact the challenged law. *Noatak*, 38 F.3d at 1510. Therefore, *City of Mesquite* does not establish a rule from which our *Noatak* line of cases depart; rather, I view the case as an example of the unusual circumstances that would permit a court to reach the merits when statutory change would otherwise render the case

moot. *Cf. City of Mesquite*, 455 U.S. at 288 (explaining that had the Court of Appeals been "fully advised" that the City had repealed the objectionable language, it "[a]rguably" "would have regarded the vagueness issue as moot"). The line of cases I cite is our circuit authority interpreting *City of Mesquite*, and should be followed absent an en banc decision to the contrary.

The Supreme Court's decision in *Kremens v. Bartley*, 431 U.S. 119 (1977), a case decided before *City of Mesquite*, is instructive in this regard. In *Kremens*, the named plaintiffs challenged the constitutionality of portions of a Pennsylvania statute governing the voluntary admission of juveniles to mental health institutions. *Id.* at 122. After the district court declared the challenged provisions unconstitutional, and while the appeal was pending, Pennsylvania enacted a new statute completely repealing the objectionable provisions, except as related to a category of persons not including the named plaintiffs. *Id.* at 126–27. The Court held that "the enactment of the new statute" during the pendency of appeal, "clearly moot[ed] the claims of the named appellees." *Id.* at 128. There was no suggestion that Pennsylvania had to prove with certainty that it would not reenact the previously-repealed statute for the Court to conclude the new statute mooted the relevant claims. This Supreme Court precedent is obviously inconsistent with the majority's analysis.

*City of Mesquite* did not overrule *Kremens*, which reinforces the view that what drove the Court's decision in *City of Mesquite* was the City's past gamesmanship and stated intent to reenact the challenged ordinance. In *Kremens*, there was no suggestion that Pennsylvania was engaged in the kind of "repeal-reenact" maneuvering that City of Mesquite was found to be engaged in years later.

Thus, *Kremens* helps illuminate the proper way to frame the mootness-due-to-statutory-change principle: *Kremens* stands for the proposition that statutory repeal is usually enough to render a case moot, while *City of Mesquite* outlines an instance when statutory repeal will not be enough. Our line of cases running from *Noatak* to *Helliker* to *Log Cabin Republicans* is faithful to *Kremens*, and reconcilable with *City of Mesquite*. With due respect to my colleagues, the charge that I have flipped *City of Mesquite* on its head is completely unfounded.[1]

---

[1] The majority challenges my use of *Kremens* to frame *City of Mesquite*, and stresses that the key fact underpinning *City of Mesquite*'s mootness holding is that "the city would have the *power* to reenact the same invalidated law" upon vacatur of the district court's decision. Maj. Opn. at 19, n.6. But *Kremens* actually demonstrates why the power to reenact an invalidated law, alone, cannot be a basis for separating cases that are moot from those that are not. In *Kremens*, the Court concluded the case was moot due to statutory change (as to the named appellees), *and* vacated the district court's judgment declaring the previous statutory provisions unconstitutional. *Kremens*, 431 U.S. at 126–27, 137. In other words, after the Court's decision in *Kremens*, the Pennsylvania Legislature, like the city in *City of Mesquite*, retained the power to reenact the same invalidated law. Therefore, *Kremens* and *City of Mesquite* do not differ on the basis of the City's retained power to reenact the invalidated law, as the majority suggests. Instead, the only meaningful distinction between the two cases was City of Mesquite's avowed intent to reenact a previously invalidated law. We have repeatedly, and properly, highlighted this distinction in our line of decisions holding that statutory change is generally enough to render a case moot. *Noatak*, 38 F.3d at 1510; *Helliker*, 463 F.3d at 878; *Log Cabin Republicans*, 658 F.3d at 1167; *see Qwest Corp. v. City of Surprise*, 434 F.3d 1176, 1181 (9th Cir. 2006) ("In *City of Mesquite*, the Supreme Court refused to dismiss a claim as moot because the city had announced an intention to reenact the same statute if the Court vacated the district court's judgment.").

## C.

The third part of the majority's argument—and one that underpins the other two parts—relies on a purported distinction between statutory change that occurs in response to an adverse judicial ruling and statutory change that occurs *in vacuo*. Citing *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1125 (9th Cir. 2011), and other cases, the majority contends that statutory change that occurs in response to a district court's judgment amounts to "grudging acquiesce to a judicial command," and so cannot render a case moot, while "voluntary" statutory change indicates a more "permanent intent to change course" that supports a finding of mootness. Maj. Opn. at 23, n.7, 23. In the majority's view, the voluntariness of the statutory change provides a key basis upon which to separate cases rendered moot by statutory change from those that are not.

I disagree that this is a meaningful doctrinal distinction upon which our cases can be categorized. First, binding

---

The majority also invokes *Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 661–62 (1993) to support their reading of *City of Mesquite*, but that case only reinforces the unique circumstances in which legislative change will not moot a case. In *Northeastern Florida*, the city moved to dismiss the case as moot after repealing an ordinance the district court had declared unconstitutional, and replacing it with a substantially similar ordinance. *Id.* at 660–62. In holding that the case was not rendered moot by the change, the Court explained "[t]here is no mere risk that [the City] will repeat its allegedly wrongful conduct; it has already done so." 508 U.S. at 662. Therefore, rather than demonstrate that my reading of *City of Mesquite* is incorrect, *Northeastern Florida* simply reinforces those instances in which statutory change will not render a case moot—that is, where a city (or legislature) repeals an invalidated law but has demonstrated a likelihood of reenacting the same law, or of reengaging in unlawful conduct.

precedent from both the Supreme Court and our circuit holds that statutory change is enough to render a case moot even when such change follows an adverse judicial ruling. In *Kremens*, discussed above, the Court held that a constitutional challenge to provisions of a Pennsylvania statute was moot where, after an adverse judicial ruling below, the legislature repealed and replaced the provisions. 431 U.S. at 127–29. Similarly, in *Log Cabin Republicans*, our court held that a constitutional challenge to Congress's "Don't Ask, Don't Tell" policy was moot where Congress repealed the statute after the district court ruled the policy was unconstitutional. 658 F.3d at 1165–66. In these and other cases, *see, e.g.*, *Maldonado v. Morales*, 556 F.3d 1037, 1042–43 (9th Cir. 2009) (holding that the California Legislature's amendment of a statute to cure a constitutional defect, effected after the district court issued an injunction remedying the defect, mooted the court's injunction), legislative change sufficed to moot an appeal even when the change was likely in response to an adverse court ruling or a lawsuit. *Cf. Qwest Corp. v. City of Surprise*, 434 F.3d 1176 (9th Cir. 2006) (cities' enactment of new ordinances after plaintiff filed action arguing that previous ordinances were preempted by federal law sufficient to render plaintiff's claims moot).

Second, and more fundamentally, it is not conceptually tenable to draw a line between statutory change "prompted by" an adverse judicial ruling, Maj. Opn. at 21, and statutory change that merely follows an adverse judicial ruling. Outside of relatively clear situations—e.g., where a constitutionally suspect statute expires during pendency of appeal due to a sunset provision—there is not a reliable way of establishing that statutory change that occurs after an adverse judicial ruling is not, in fact, a response to that ruling. The most reasonable presumption is that when a

legislature changes a law after a federal court invalidates that law, the change was prompted by the federal court ruling. Therefore, the majority is incorrect to suggest we can generally divide cases mooted by statutory change from those that are not based on the presence or absence of a causal link between the statutory change and an adverse judicial ruling.

## III.

I agree with my colleagues on one point—our mootness-due-to-statutory-change cases are indeed "murky." Maj. Opn. at 27. But even if the doctrine contains a certain opacity, it is clear enough on the principle relevant here: a statutory change is "usually enough to render a case moot" unless "it is virtually certain that the repealed law will be reenacted." *Log Cabin Republicans*, 658 F.3d at 1167 (quoting *Helliker*, 463 F.3d at 878). That principle is consistent with, rather than a departure from, *City of Mesquite*, and binding on our panel. We should abide by it here and conclude that this case is moot.

As a final observation, I point out that even though our *Noatak* line of decisions has not thoroughly explained the rationale behind the rule that statutory change is usually enough to render a case moot, there are good reasons for such a rule. One is that the formal, deliberative nature of the legislative process makes statutory change relatively difficult to undo on a whim. Having run the gauntlet of formal procedure, political debate, and legislative trade-offs involved in repealing and replacing a constitutionally suspect law, it seems unlikely that a legislature, as a general rule, would be inclined to reenact a repealed law. *Cf.* Neal Kumar Katyal & Thomas P. Schmidt, *Active Avoidance: The Modern Supreme Court and Legal Change*, 128 Harv. L. Rev. 2109, 2120 (2015) ("[A] rational Congress would

generally be reluctant to take the time and energy required to pass a statute that a court has already signaled it might find unconstitutional."). Instead, the more logical presumption is that once Congress or a state legislature repeals or amends an objectionable statute, that change is likely to remain absent a strong indication the legislature intends to undertake the laborious process of reenacting the repealed law. In my view, our rule that statutory change is usually enough to render a case moot correctly reflects the realities of legislative action.

## IV.

For the foregoing reasons, I conclude the Nevada Legislature's repeal of SB 223, and its enactment of SB 338, renders this case moot. Under *Noatak*, a state legislative enactment is "usually enough to render a case moot" unless the case presents a "rare" situation such as "where it is virtually certain that the repealed law will be reenacted." *Noatak*, 38 F.3d at 1510. That is not the case here, and so we have no basis upon which to reach the merits. *See Gator.com Corp.*, 398 F.3d at 1132 ("[T]he bounds of our judicial power cannot be overstepped for the sake of expediency."). Instead, the correct course of action is to vacate the district court's judgment and remand with instructions to dismiss the case as moot. *See Helliker*, 463 F.3d at 878–79.

I respectfully dissent.