No. 18-0857-cv(L)
32BJ N. Pension Fund v. Nutrition Mgmt. Servs.

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2018

No. 18-0857-cv(L), 18-1843-cv(CON)

THE 32BJ NORTH PENSION FUND AND ITS BOARD OF TRUSTEES,
*Plaintiff-Appellee*,

*v.*

NUTRITION MANAGEMENT SERVICES COMPANY, AKA Nutrition Management Services Corp., AKA Nutrition Management Services, Inc.,
*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of New York.
No. 15-cv-8680 — Katherine B. Forrest, *Judge.*

ARGUED: MAY 7, 2019
DECIDED: AUGUST 20, 2019

Before: NEWMAN, JACOBS, and DRONEY, *Circuit Judges.*

Defendant-Appellant Nutrition Management Services Company ("NMSC") appeals from a final judgment of the United States District Court for the Southern District of New York (Forrest, *J.*). NMSC entered into a collective bargaining agreement ("CBA") in 1998 that required it to make pension contributions on behalf of its employees to Plaintiff-Appellee, the 32BJ North Pension Fund. After NMSC failed to make the required contributions from 2008 to 2015, the Fund brought this ERISA action seeking unpaid contributions. Following a bench trial, the district court awarded the Fund damages that included an interest rate set forth in a delinquency policy established pursuant to a trust agreement referred to in NMSC's 1998 CBA with the 32BJ union. The district court held that NMSC's mere reference bound NMSC to the trust agreement and its delinquency policy, without concluding that the reference demonstrated NMSC's intent to be bound. NMSC argues that, until it executed an amendment to the CBA in 2014, it did not agree to be bound to the trust agreement, and thus the delinquency policy's interest rate did not apply. We agree with NMSC. Accordingly, we **VACATE** the judgment of the district court and **REMAND** for the district court to redetermine the amount of damages, consistent with this opinion, and to reconsider the amount of its award of attorney's fees.

JOHN HOUSTON POPE, Epstein Becker & Green, P.C., New York, NY, *for Defendant-Appellant*.

RICHARD SCOTT SIEGEL (Jeffrey S. Swyers, *on the brief*), Slevin & Hart, P.C., Washington, DC, *for Plaintiff-Appellee*.

DRONEY, *Circuit Judge*:

This appeal primarily concerns whether, in an action brought under the Employee Retirement Income Security Act ("ERISA") against an employer for unpaid pension fund contributions, 29 U.S.C. §§ 1132(g)(2), 1145,[1] the employer was bound to a term established by an ERISA plan document where the collective bargaining agreement ("CBA") that the employer signed only *referred* to the plan document but the employer did not expressly agree to be bound by that document. The district court in this action so held, awarding to the Plaintiff-Appellee 32BJ North Pension Fund ("the Fund") damages for unpaid contributions from 2008 to 2015 that included a substantial interest component. The interest rate was established by a Delinquency Policy that was adopted by the Fund under a Trust Agreement. The district court held that the Defendant-Appellant

---

[1] The title of 29 U.S.C. § 1145 refers to "delinquent" contributions, while § 1132(g)(2) refers to "unpaid" contributions. We use these terms interchangeably in this opinion.

3

employer, Nutrition Management Services Company ("NMSC"), was bound by the terms of the Trust Agreement because NMSC signed a 1998 CBA that, in the district court's words, "specifically reference[d]" the Trust Agreement. *32BJ N. Pension Fund v. Nutrition Mgmt. Servs.*, 15-cv-8680 (KBF), 2017 WL 4863095, at *7 (S.D.N.Y. 2017).

On appeal, NMSC contends that it did not agree to be bound to the Trust Agreement until it entered into a 2014 Memorandum of Agreement ("MOA") that, in amending and extending the CBA, specifically adopted the Trust Agreement and its associated policies, retroactive to August 1, 2013. App'x 385. NMSC argues that the Trust Agreement's interest rate for unpaid contributions should have been applied only beginning on August 1, 2013, not from 2008 when the delinquent contributions began accruing. The result of the district court's error, NMSC contends, is that the damages awarded to the Fund overstate the amount NMSC owes by at least $200,000.

4

We clarify, consistent with our precedent and that of the Supreme Court, that an employer in an ERISA action for unpaid contributions is bound to the terms of an ERISA plan document (here, a Trust Agreement) only if the employer objectively manifests an intent to be so bound, as evaluated under ordinary principles of contract interpretation. Applying those familiar principles here, we conclude that NMSC did not bind itself to the Trust Agreement—and the interest rate established under its Delinquency Policy—until NMSC agreed to the MOA modifying the CBA in 2014.

We also reject the Fund's alternative argument that applying ERISA-plan-based interest provisions is so fundamental to the functioning of a fund that its trustees may unilaterally impose such provisions on a delinquent employer.

Accordingly, we vacate the judgment of the district court and remand for the district court to redetermine the amount of damages,

5

consistent with this opinion, and to reconsider the amount of its award of attorney's fees in light of that redetermination.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I. The Pertinent Agreements and Other Documents**

NMSC provides food services to nursing homes in New York state. One of its nursing home clients is Hebrew Hospital Home of Westchester. NMSC's employees at that nursing home are members of union Local 32BJ of the AFL-CIO ("the union" or "Local 32BJ").

On September 1, 1998, NMSC entered into a CBA with Local 32E, the predecessor union to Local 32BJ.[2] Article 22 of the CBA required that NMSC "shall contribute to the . . . Pension Fund" a fixed sum for "all employees in the bargaining unit" who met certain conditions.[3] App'x 412. Importantly, Article 22 also stated, "[t]he

---

[2] There is no dispute that Local 32BJ is bound to the 1998 CBA.

[3] The Fund is a so-called "Taft-Hartley" trust fund, established pursuant to Section 302(c) of the Taft-Hartley Act of 1947 (otherwise known as the Labor Management Relations Act). 29 U.S.C. § 186(c). The Fund administers a "multiemployer" ERISA plan, which "is a collectively bargained [ERISA] plan maintained by more than one employer, usually within the same or related industries, and a labor

6

parties understand that the . . . Fund will be held and managed under the terms and provisions of an Agreement and Declaration of Trust to be executed in connection with the said Fund . . . ." *Id.*

The operative "Agreement and Declaration of Trust" described in Article 22 of the CBA was, at all times relevant to this case, the "Amended and Restated Agreement and Declaration of Trust." App'x 416–39. We refer to that document as the "Trust Agreement," as do the parties. As pertinent to this appeal, Article VII, Section 8 of the Trust Agreement specifies that "[a]n Employer that does not pay Contributions when due shall be obligated to pay, in addition to any penalties required under any applicable Collective Bargaining

union." *Introduction to Multiemployer Plans*, Pension Benefit Guaranty Corp., https://www.pbgc.gov/prac/multiemployer/introduction-to-multiemployer-plans (last visited July 30, 2019); *see Bd. of Trs. of Glazing Health and Welfare Tr. v. Chambers*, 903 F.3d 829, 835 (9th Cir. 2018) (describing such plans), *reh'g en banc granted*, 923 F.3d 1162 (9th Cir. 2019). Such trust funds "are administered jointly by employer-designated trustees and union-designated trustees," and they allow for multiple employers to make "welfare and benefit" contributions "for the benefit of [a] union's members." *Levy v. Local Union Number 810*, 20 F.3d 516, 517–18 (2d Cir. 1994). In turn, such funds "provide welfare [or] pension benefits to [union] employees . . . ." *Chambers*, 903 F.3d at 835.

Agreement or other contract," *inter alia*, "interest on the unpaid Contribution at such rate as the Trustees may fix from time to time." App'x 700, 432–33.[4]

In accordance with that interest provision in the Trust Agreement, the Fund's trustees in 2008 established the first version of the "Policy for Collection of Delinquent Contributions," which we and the parties refer to as the "Delinquency Policy." App'x 670–84. Article 2, Section 2.1, Part C of the Delinquency Policy established a 10% annual interest rate for delinquent contributions to the pension fund. Then, effective June 1, 2013, the trustees established a revised Delinquency Policy, which lowered the interest rate to 9%.

On April 30, 2014, NMSC executed a Memorandum of Agreement ("MOA") with the union, which "continu[ed] in full force" the terms of the CBA "for the period from August 1, 2013

---

[4] The parties did not submit at trial a Trust Agreement that controlled in 1998, but only the versions from 2001 and 2014. But they agree that the language from Article VII, Section 8, contained in both submitted versions, was the relevant language as to interest on unpaid contributions.

through July 31, 2014," and also, among other things, added a new Article applicable to NMSC's pension fund contributions.[5] App'x 384–85. The new Article stated that "the Employer [NMSC] *hereby adopts and shall be bound by* the [Trust Agreement] as it may be amended *and the rules and regulations adopted or hereafter adopted* by the Trustees of each Fund in connection with the provision and administration of benefits and the collection of contributions." App'x 385 (emphasis added).

## II. The Fund's Action for Unpaid Contributions

Between 2008 and 2015, NMSC failed to make its required contributions to the Fund. The Fund conducted two audits (the "First Audit" and "Second Audit") of NMSC's records, which discovered some of these unpaid contributions, after which the Fund filed this suit. The Fund then conducted another audit (the "Third Audit"),

---

[5] The 1998 CBA was extended during all relevant periods by a series of memoranda of agreement between Local 32BJ (or its predecessor) until the 2014 MOA. Those prior memoranda did not adopt the Trust Agreement.

which increased the amount that it sought to recover in this action.[6]

The district court granted summary judgment to the Fund as to the unpaid contributions discovered by the Second Audit. The district court held a bench trial with regard to issues surrounding the remaining unpaid contributions discovered by the First and Third Audits. The district court also received post-trial briefing as to the interest NMSC was required to pay for its unpaid contributions.

The district court issued its findings of fact and conclusions of law in an opinion on October 27, 2017. The district court held that the Fund was entitled to recover the remaining unpaid contributions not resolved at summary judgment, and NMSC does not challenge that holding (or the summary judgment decision) with regard to the amount of principal owed.

The district court also held, however, that NMSC was required to pay the interest rate stated in the Delinquency Policy on all the

---

[6] The damages amounts awarded by the district court for the Third Audit are not disputed on appeal.

10

unpaid contributions, including those discovered in the Second Audit, compounding from when they became due beginning in 2008, and thereafter. It rejected NMSC's argument that the company was not bound to the Delinquency Policy's interest rate until it executed the 2014 MOA. The district court reasoned that NMSC's 1998 CBA with the union "specifically reference[d]" the Trust Agreement "[by] stating that the Fund 'will be held and managed under the terms and provisions of [the Trust Agreement].'" *32BJ N. Pension Fund*, 2017 WL 4863095, at *7 (quoting Article 22 of the Trust Agreement, App'x 412–13). In turn, the district court stated, the Trust Agreement "reference[d]" the Delinquency Policy. *Id*.

NMSC filed an unsuccessful motion for reconsideration of the interest rate issue, and it timely appealed from the district court's final judgment.[7]

---

[7] Two appeals were filed in this action: 18-0857-cv and 18-1843-cv. The former concerned contributions and interest, while the latter concerned the district court's award of attorney's fees. The two appeals were consolidated in this Court.

11

**STANDARD OF REVIEW**

"On appeal from a bench trial," we review "conclusions of law *de novo*" and "findings of fact for clear error." *Fed. Housing Fin. Agency for FNMA v. Nomura Holdings Am., Inc.*, 873 F.3d 85, 138 n.54 (2d Cir. 2017). "Although the amount of recoverable damages is a question of fact, the measure of damages upon which the factual computation is based is a question of law." *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 196 (2d Cir. 2003) (internal quotation marks omitted). "Contract interpretation [is also] a question of law . . . reviewed *de novo* on appeal." *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 384 (2d Cir. 2007).

**DISCUSSION**

On appeal, NMSC argues that the district court erred by applying the Delinquency Policy's interest rate to NMSC's unpaid contributions beginning in 2008, rather than from August 1, 2013—

the effective date of the 2014 MOA.

In response, the Fund contends—mirroring the district court's conclusion of law following the bench trial—that because the 1998 CBA "referenced" the Trust Agreement, NMSC was already bound to the Trust Agreement (and to any Delinquency Policy established under its authority) as of 1998. The Fund also argues that even if NMSC did not agree to be bound to the Trust Agreement before the 2014 MOA, the Fund's trustees were entitled to unilaterally impose that rate on NMSC.

In addition to the interest-rate issues, the parties also dispute whether the district court's award of attorney's fees to the Fund was excessive.

We address these issues in turn.

13

**I.   Whether NMSC Agreed to Be Bound to the Trust Agreement and Delinquency Policy in the 1998 CBA**

**A.   Applicable Law**

ERISA authorizes fiduciaries of an employee benefit plan[8] to bring suit to compel the payment of delinquent fund contributions. 29 U.S.C. §§ 1132(g), 1145.  In such an action "in which a judgment in favor of the plan is awarded," the court must award

> (A) the unpaid contributions, (B) interest on the unpaid contributions, (C) an amount equal to the greater of—(i) interest on the unpaid contributions, or (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent of the [unpaid contributions] . . . , [and] (D) reasonable attorney's fees and costs . . . .

29 U.S.C. § 1132(g)(2).

"[I]nterest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed

---

[8] "The term 'employee benefit plan' or 'plan' means an employee welfare benefit plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan." 29 U.S.C. § 1002(3).

14

under section 6621 of title 26."[9]  *Id*. § 1132(g).  We have recognized that "the plan," *id*. § 1132(g), may, as here, be "the trust agreement or contract under which the plan was formed,"  *Silverman v. Teamsters Local 210 Affiliated Health & Ins. Fund*, 761 F.3d 277, 286 (2d Cir. 2014).

To impose a plan-provided interest rate on a delinquent employer, there is an additional requirement:  The employer must be a signatory—or otherwise have agreed to bind itself—to the plan document (here, a Trust Agreement).  *Jaspan v. Glover Bottled Gas Corp.*, 80 F.3d 38, 40–42 (2d Cir. 1996).  In *Jaspan*, the trustees of the fund sought from the defendant employer a liquidated damages

---

[9] The "underpayment rate" established under 26 U.S.C. § 6621(a)(2) is the sum of three percent plus the "Federal short-term rate," the latter of which is determined by the Secretary of the Treasury (or the Secretary's delegate) and then "rounded to the nearest full percent," *id*. § 6621(b)(1),(3).  Between 2008 and the time of the district court's judgment, it appears that the underpayment rate ranged from a low of 3% to a high of 6%, with the rate being 4% for most of the pertinent time period.  *See* Index of Applicable Federal Rates (AFR) Rulings, IRS, https://apps.irs.gov/app/picklist/list/federalRates.html (last visited July 31, 2019) (setting forth monthly Federal "Short-Term" rates).  Without expressing an opinion as to which of these rates might apply to any of NMSC's delinquent contributions, we observe that the underpayment rates for the pertinent time period were always lower than the 9% or 10% interest rates set forth in the operative versions of the Delinquency Policy.

award of fifty-percent of the employer's contributions because the employer failed to keep adequate payroll records for a future audit by the fund. *Id*. at 40. The liquidated damages provision was in a trust agreement that the employer had not signed or otherwise agreed to be bound to. *Id*. Merely "agree[ing] through . . . collective bargaining agreements to pay contributions to . . . Funds," we held, did "not justify holding [the defendant employer] to . . . provision[s] of a trust agreement that it never joined in." *Id*.

The Fund argues that *Jaspan* established a way for employers to bind themselves to an ERISA plan that does not adhere to ordinary principles of contract interpretation. It relies on our statement in *Jaspan* that "[h]ad the parties intended to bind [the employer] to [the trust agreement's] terms, they could easily have done so by having [the employer] sign the Agreement or *by referencing it* in the collective bargaining agreements." *Jaspan*, 80 F.3d at 40 (emphasis added). In the Fund's view of that language, as well as the view of the district

16

court in its trial findings, an employer is bound to a trust agreement if its CBA merely "references" the trust agreement. Appellees' Br. at 21; *32BJ N. Pension Fund*, 2017 WL 4863095, at *7.

The Fund's reading of *Jaspan* is incorrect. The ultimate question, we made clear in the quoted sentence, was whether any signature on the ERISA plan document, or "referenc[e]" to such a document in the CBA, reflected the employer's "inten[t] to bind" itself to the plan document. *Id*. Later in the *Jaspan* opinion, we concluded that "by undertaking in a collective bargaining agreement to pay contributions to certain benefit funds, [the employer] did not *bind itself* to a liquidated damages provision contained in a governing trust agreement to which *it never agreed*." *Id*. at 42 (emphasis added). In other words, *Jaspan* merely invoked the well-established doctrine of incorporation by reference. *See, e.g.*, *Ronan Assocs. v. Local 94-94A-94B*, 24 F.3d 447, 449 (2d Cir. 1994) (recognizing that parties may "manifest[] an intent" to "incorporate by reference . . . terms that may

17

be found in other agreements to which they are not party"). *Jaspan* plainly requires that an employer must objectively manifest its intent to be bound to an ERISA plan document, not merely note the document's existence, or as in this case, acknowledge that a future trust agreement will manage the operation of the fund.

Moreover, the Supreme Court has held that collective-bargaining agreements and ERISA plan documents "must be interpreted according to ordinary principles of contract law." *CNH Indus. N.V. v. Reese*, 138 S. Ct. 761, 763 (2018) (rejecting the Sixth Circuit's repeated use of "inferences" about CBA language that were inconsistent with ordinary contract principles); *M & G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926, 933 (2015) ("We interpret collective-bargaining agreements, including those establishing ERISA plans, according to ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy."). As with all contracts, "[w]here the words of a contract in writing are clear and

18

unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." *M&G Polymers*, 135 S. Ct. at 933 (internal quotation marks omitted).

**B.      Application to the Documents at Issue**

Applying these ordinary contract-interpretation principles, we next decide whether NMSC agreed to be bound to a future Trust Agreement in the 1998 CBA, or only when the MOA was executed in 2014.[10]  "Where the parties dispute the meaning of particular contract clauses, the task of the court is to determine whether such clauses are ambiguous when read in the context of the entire agreement . . . ." *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) (internal quotation marks omitted).  The Fund does not dispute NMSC's contention that the CBA and the 2014 MOA, which amended and extended the CBA, must be read together.

The 1998 CBA stated, "[t]he parties understand that the . . .

---

[10] NMSC agrees that once it executed the MOA in 2014, it was bound to the interest rate provisions stated in the Delinquency Policy.

19

Pension Fund will be held and managed under the terms and provisions of an Agreement and Declaration of Trust to be executed in connection with the said Fund." App'x 412. The Fund argues that this language demonstrated NMSC's intent to bind itself to the terms of a future Trust Agreement and to the rules and regulations that the trustees adopted under its authority. NMSC disagrees, arguing that the 1998 CBA language merely memorialized that NMSC's contribution payments would be held in a trust and would not constitute illegal payments to the union, and recognized that a future Trust Agreement would be adopted by the trustees to govern the operation of the Fund.

We agree with NMSC's interpretation. The 1998 CBA language memorialized the parties' "understand[ing]" that the Fund—not NMSC—would be governed by the terms of a future trust agreement. *Id*. Contrary to the Fund's contention that such language would be meaningless, it is consistent with the parties seeking to ensure that the

20

Fund would comply with Section 302 of the Labor Management Relations Act. *See, e.g., Moglia v. Geoghegan*, 403 F.2d 110, 115 (2d Cir. 1968) ("Section 302 [of the Labor Management Relations Act] . . . prohibit[s] the establishment of any union funds by means of employer payments unless the funds conform[] in all respects with the specific dictates of Section 302(c)."). By contrast, NMSC's affirmative obligations in Article 22 were clearly set forth by stating that NMSC "shall," for example, contribute certain sums to the Fund or furnish to the union certain information about covered employees. App'x 412.

Our conclusion that the 1998 CBA did not demonstrate NMSC's agreement to the subsequently adopted Trust Agreement is strengthened by the fact that such a reading would render language in the 2014 amendments meaningless. *Contra, e.g., Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 132 (2d Cir. 2005) ("[W]e must . . . avoid rendering any of the CBA language superfluous."). The 2014 MOA

stated as follows:

> By agreeing to make the required payments into the Funds, the Employer *hereby adopts and shall be bound by* the Agreement and Declaration of Trust as it may be amended *and the rules and regulations adopted or hereafter adopted* by the Trustees of each Fund in connection with the provision and administration of benefits and the collection of contributions.

App'x 385 (emphasis added).

"Hereby" means "as a result of this," *Hereby*, Oxford English Dictionary (2d ed. 1989), and "adopt" means to "approve or accept . . . formally," *Adopt*, *id*. (3d ed. 2011). Thus, in the 2014 MOA, NMSC "hereby adopt[ed]" and agreed to "be bound" for the first time to the Trust Agreement, as well as "the rules and regulations" adopted under the Trust Agreement's authority. App'x 385. Under the Fund's interpretation of the 1998 CBA, by contrast, NMSC would have agreed to be bound to a future Trust Agreement in 1998 and to its

22

rules and regulations; the language in the 2014 MOA would be superfluous.[11]

Therefore, NMSC did not bind itself to the Trust Agreement until it executed the 2014 MOA, which was effective only as of August 1, 2013.[12, 13]

---

[11] The Fund contends that the 2014 MOA "clarified" the 1998 CBA language. Appellee's Br. at 4.

[12] It is unclear whether NMSC's position is that only contributions that first became delinquent after August 1, 2013, should have been assessed the Delinquency Policy's interest rate, or rather that all unpaid contributions (from 2008 and after) should have begun being assessed that interest rate as of August 1, 2013—or some other position. That issue has not been squarely presented to us, and we leave it to the district court to consider in the first instance, subject to the law of the case and the usual principles of forfeiture and waiver by either party (if applicable). In addition, NMSC acknowledged at oral argument that any revised award for unpaid contributions is also subject to liquidated damages, which also must be determined by the district court.

[13] NMSC also argues that, absent being bound to the Delinquency Policy's interest rate before August 1, 2013, it is not required to pay ERISA-based statutory interest on any delinquent contributions that it paid before the Fund commenced this action. In support, NMSC relies primarily on *Iron Workers Dist. Council v. Hudson Steel Fabricators & Erectors, Inc.*, 68 F.3d 1502, 1507 (2d Cir. 1995). Our holding in *Iron Workers*, however, addressed a different scenario: an employer who had outstanding unpaid contributions at the time suit was filed could not, we decided, escape remedies under 29 U.S.C. § 1132(g)(2) by paying off "all delinquent contributions owed . . . after suit was filed but prior to judgment." *Id*. at 1504. Notably, we reasoned that "an award of interest or liquidated damages should logically be predicated upon the amount of the unpaid contributions *originally at issue* . . . since that amount correctly *measures the damage caused* by the

23

**II.      Whether the Fund Was Entitled to Unilaterally Impose the Interest Rate on NMSC**

The Fund also argues that even if NMSC did not agree to be bound to the Trust Agreement prior to executing the 2014 MOA, applying the interest rate stated in the Delinquency Policy from 2008 onward was so essential to the Fund's functioning that NMSC should be unilaterally bound to it. The Fund relies on language in *Jaspan*, where we observed that other circuits had identified a limited exception to the general rule that employers must agree to be bound to an ERISA plan document: a provision that "enforc[es] against the non-[agreeing] employer . . . the right of the fund trustees to audit the employer's records." 80 F.3d at 41. Those circuits' justification for

---

delinquency." *Id*. at 1506 (emphasis added). We did not decide that the unpaid contributions "originally at issue" include only those that remain unpaid at the time of suit, although we acknowledged decisions from other circuits that had so held. *Id*. at 1506–07. Indeed, NMSC concedes that, to the extent language in *Iron Workers* supports its position, it is dicta. Appellant's Br. at 15 n.7. The Fund does not respond to NMSC's argument on this issue, but we do not deem that a concession by the Fund because the issue is counterfactual; the judgment before us does not include statutory interest. We thus leave this issue—if raised and disputed on remand—for the district court to consider in the first instance.

that exception, we observed, was that "[f]und trustees have a fundamental duty to locate and take control of fund property—a duty for which the right to audit is crucial." *Id*.

Our decision in *Jaspan*, however, is unhelpful to the Fund for this argument as well. There, we decided that a fund's trustees could not enforce a liquidated damages provision to which the employer did not agree because, although that provision "may be helpful to the trustees," it "is not [as] essential to their management of the Funds" as the right to audit, and enforcing such a provision against a non-agreeing employer "raises far greater concerns [of] . . . fairness." *Id*. Plan-based interest provisions that depart from the default amounts provided by ERISA are more similar to a liquidated damages provision than the right to audit an employer's records. For one, allowing a fund's trustees to unilaterally impose on an employer an interest rate they selected presents a considerable "concern[] [of] . . . fairness" to the employer. *Id*. Indeed, in this case, a substantial

25

portion of the damages the Fund was awarded in the district court derives from interest rates to which NMSC did not agree.

Moreover, less like the essential right to audit employers' records—and much like a liquidated damages provision—parties would expect to bargain over interest provisions that depart from the default amounts provided by ERISA. Such bargaining is evident here in the 2014 MOA, where NMSC agreed with the union to be bound to the Trust Agreement and its associated rules and regulations for the first time.

We therefore conclude that the Fund's trustees were not entitled to unilaterally impose on NMSC a plan-based interest rate for unpaid contributions.[14]

---

[14] The Fund also asserts that NMSC forfeited in the district court its right to challenge the application of the Delinquency Policy's interest rate. The Fund maintains that, in its summary judgment motion, it explicitly sought the Delinquency Policy's interest rate on all unpaid contributions and that NMSC did not challenge that rate in its brief opposing the Fund's summary judgment motion. We agree with NMSC that the interest-rate issue was not forfeited; after the purported forfeiture occurred, the district court considered the question and rendered a decision on the merits. That is sufficient to preserve the issue for our review. *See Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 201 (2d Cir. 2004) ("Because [the

## III.    Attorney's Fees

NMSC's other primary issue raised on appeal is that, in its view, the district court awarded the Fund excessive attorney's fees in the amount of approximately $160,000.[15]    NMSC argues that the Fund's counsel overstaffed,  block-billed, and charged fees on fees.

The parties agree that if we were to vacate and remand for a redetermination of damages, it would be appropriate for the district court to reconsider its award of attorney's fees.  Given that result, we accordingly direct the district court to reconsider the amount of its fee award after redetermining the damages owed to the Fund.

---

defendant's] position on the [issue] was explicitly considered and rejected by the district court . . . , we conclude that the issue is not [forfeited] on appeal.").

[15] ERISA provides that in a successful suit for recovery of unpaid contributions, "the court shall award the plan . . . reasonable attorney's fees and costs of the action, to be paid by the defendant."  29 U.S.C. § 1132(g)(2)(D).

## CONCLUSION

For the foregoing reasons, we **VACATE** the judgment of the district court and **REMAND** for the district court to redetermine the amount of damages, consistent with this opinion, and to reconsider the amount of its award of attorney's fees.